

FILED & ENTERED

JUL 31 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY llewis      DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

| | |
|---|---|
| In re:    MyLife.com Inc., Debtor. | Case No.: 2:22-bk-14858-ER |
| United States Of America,<br><br>Plaintiff,<br><br>v.<br><br>MyLife.com Inc.,<br><br>Defendant. | Adv. No.: 2:23-ap-01094-ER<br><br>**MEMORANDUM OF DECISION: (1) GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT FILED BY THE UNITED STATES AND (2) DENYING MOTION TO REJECT STIPULATED JUDGMENT FILED BY THE DEBTOR[1]**<br><br>Date:    June 7, 2023<br>Time:    10:00 a.m.<br>Location: Ctrm. 1568<br>          Roybal Federal Building<br>          255 East Temple Street<br>          Los Angeles, CA 90012 |

   At the above-captioned date and time, the Court conducted hearings on (1) the motion for summary judgment (the "MSJ") filed by the United States of America (the "US") and (2) the motion of MyLife.com Inc. (the "Debtor") to reject a stipulated judgment.[2] For the reasons set

---

[1] This Memorandum of Decision will be docketed in the adversary proceeding and the main bankruptcy case because it addresses matters pertaining to both.

[2] The Court considering the following pleadings in adjudicating these matters:
  1) US Motion for Summary Judgment:
     a) The United States of America's Complaint to Determine that its Debt is Excepted from Discharge Under 11 U.S.C. § 1141(d)(6)(A) [Adv. Doc. No. 1] (the "Complaint");
     b) The United States's Notice of Motion and Motion for Summary Judgment [Adv. Doc. No. 19] (the "MSJ");

forth below, the MSJ is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Debtor is precluded from contesting its liability under the first, second, fourth, and fifth elements of § 523(a)(2)(A), but is *not* precluded from contesting its liability under the third element of § 523(a)(2)(A) (intent to deceive). The only issue that remains for trial is whether the Debtor intended to deceive those consumers to whom it made misrepresentations. The Debtor's motion to reject the Stipulated Judgment (as defined below) is **DENIED**.

## I. Background

The Debtor filed a voluntary Chapter 11 petition on September 2, 2022 (the "Petition Date"). Jeffrey Tinsley ("Tinsley") is the Debtor's CEO and holds a 49% interest in the Debtor. The Debtor operates a website that allows subscribers to run background checks on individuals.

On July 27, 2020 (prior to the Petition Date), the United States of America (the "US") filed a complaint against the Debtor and Tinsley in the District Court (the "District Court Complaint"), seeking relief for (1) deceptive business practices in violation of § 5(a) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45(a), (2) violation of the Telemarketing Sales Rule (the "TSR"), 16 C.F.R. § 310.3(a)(1)–(2), and (3) violation of the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. § 8403 (collectively, the "Consumer Protection Statutes"). *See* Case No. 2:20-cv-6692-JFW (Central District of California) (the "District Court Action").

On October 19, 2021, the District Court entered summary judgment in favor of the United States [Complaint, Ex. B] (the "District Court Summary Judgment Order"). In a 17-page decision, the District Court found that the Debtor had violated the Consumer Protection Statutes by, among other things, (1) maintaining a website that was likely to mislead consumers in violation of § 5 of the FTC Act, (2) violating the TSR by making misleading telemarketing calls to consumers, and (3) violating ROSCA by failing to provide customers simple mechanisms to stop recurring credit-card charges. *See generally* District Court Summary Judgment Order.

//

---

    i) The United States's Statement of Uncontroverted Facts and Conclusions of Law [Adv. Doc. No. 20];
    ii) Notice of Hearing on the United States's Motion for Summary Judgment [Adv. Doc. No. 21];
    iii) [Proposed] Judgment for the United States of America [Adv. Doc. No. 25];
  c) Opposition to Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 40];
    i) Corrected Amended Statement of Genuine Issues Re: Plaintiff's Motion for Summary Judgment [Adv. Doc. No. 44];
  d) The United States of America's Reply in Support of its Motion for Summary Judgment [Adv. Doc. No. 50];
2) Debtor's Motion to Reject Stipulated Judgment:
  a) Motion to Reject Stipulated Order [Bankr. Doc. No. 172];
  b) United States of America's Objection to the Motion to Reject Stipulated Order [Bankr. Doc. No. 179]; and
  c) Reply in Support of Motion to Reject Stipulated Order [Bankr. Doc. No. 182].

On December 15, 2021, the District Court approved a *Stipulated Order for Permanent Injunction and Equitable Monetary Relief* [Complaint, Ex. C] (the "Stipulated Judgment") entered into between the US, on the one hand, and Tinsley and the Debtor, on the other hand. The Stipulated Judgment provided in relevant part:

> The facts alleged in the Complaint shall be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.
> The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

Stipulated Judgment at § VIII(B)–(C).

The Stipulated Judgment further stated that "Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order." *Id.* at "Findings," ¶ 5. It also stated that "Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in their answer to the Complaint." *Id.* at "Findings," ¶ 3.

The Stipulated Judgment entered a monetary judgment of $28,945,968 against the Debtor to be paid to the United States (the "US Debt"), and contained a schedule for payment of the judgment. The Debtor made only two payments under the payment schedule, in the total amount of $3,166,666.66.

On March 6, 2023, the US filed a *Complaint to Determine that its Debt is Excepted from Discharge Under 11 U.S.C. § 1141(d)(6)(A)* [Adv. Doc. No. 1] (the "Complaint") against the Debtor. The Complaint seeks declaratory judgment under 28 U.S.C. § 2201(a) declaring that the Stipulated Judgment is excepted from discharge under §§ 1141(d)(6)(A) and 523(a)(2)(A).

On May 9, 2023, the Court issued a *Memorandum of Decision Denying Debtor's Motion to Dismiss Complaint* [Adv. Doc. No. 43].

**A. Summary of Papers Filed in Connection with the US's Motion for Summary Judgment**

The US moves for summary judgment on two alternative grounds. First, the US argues that the District Court Summary Judgment Order precludes the Debtor from contesting the non-dischargeability of the US Debt. Second, the US argues that the Debtor waived its right to a discharge in the Stipulated Judgment, and that the waiver is enforceable.

The Debtor opposes the MSJ. It argues that to the extent the Stipulated Judgment waives the Debtor's right to challenge the dischargeability of the US Debt, the waiver is unenforceable as a violation of public policy. The Debtor further asserts that disputed issues of material fact prevent the entry of summary judgment.

In connection with its opposition to the MSJ, the Debtor filed a motion to reject the Stipulated Judgment pursuant to § 365, on the ground that the payments required under the Stipulated Judgment are burdensome to the estate. The Debtor contends that if the Stipulated Judgment is rejected, the US cannot rely upon the Stipulated Judgment in support of the MSJ.

The US maintains that rejection of the Stipulated Judgment "would be a futile act as it would not alter the US Debt or permit the Debtor to resume harming consumers in violation of the District Court's injunction …." Bankr. Doc. No. 179 at p. 5. The US further asserts that the

Stipulated Judgment is not an executory contract, and is therefore not subject to rejection, because the US does not have material ongoing obligations under the Stipulated Judgment.

## II. Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Civil Rule 56 (made applicable to these proceedings by Bankruptcy Rule 7056). The moving party has the burden of establishing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is 'material' only if it might affect the outcome of the case[.]" *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Civil Rule 56(e)). The court is "required to view all facts and draw all reasonable inferences in favor of the nonmoving party" when reviewing the Motion. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

### A. The Stipulated Judgment Does Not Contain Conflicting Provisions

The Debtor asserts that the Stipulated Judgment contains conflicting provisions and that accordingly, summary judgment is not appropriate. The Court has reviewed the provisions of the Stipulated Judgment which the Debtor characterizes as being inconsistent, and finds that there is no conflict or inconsistency between those provisions.

The Stipulated Judgment enters a monetary judgment of approximately $29 million against the Debtor (for simplicity, figures used throughout the remainder of Section II.A. are approximate). To incentivize the Debtor to pay the judgment, the Stipulated Judgment provides that if the Debtor makes payments aggregating $16 million by December 31, 2025, the remaining $13 million of indebtedness will be suspended.

The Stipulated Judgment anticipated that the Debtor might not make the payments set forth in the payment schedule and might instead seek bankruptcy protection—which is in fact what occurred. To address that possibility, the Stipulated Judgment contains the following provision:

> The facts alleged in the [District Court] Complaint shall be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.
>
> The facts alleged in the [District Court] Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

Stipulated Judgment at § VIII(B)–(C).

    The Stipulated Judgment also contains a finding that "Defendants neither admit nor deny any of the allegations in the [District Court] Complaint, except as specifically stated in their answer to the Complaint." *Id.* at "Findings," ¶ 3.

    The Debtor alleges that the finding that "Defendants neither admit nor deny any of the allegations of the [District Court] Complaint" is inconsistent with the provision stating that the "facts alleged in the [District Court] Complaint shall be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission …." The Debtor's position is without merit, as the two provisions are easily reconcilable. If the Debtor made the $16 million in payments by December 31, 2025, then the Debtor would be deemed to neither admit nor deny any of the allegations of the District Court Complaint. If, however, the Debtor defaulted on the payment schedule and sought bankruptcy protection, then the facts alleged in the District Court Complaint would be taken as true without further proof in a dischargeability proceeding. The fact that different outcomes apply depending on the action taken by the Debtor does not render the provisions inconsistent.

## B. Issue Preclusion

    "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). Issue preclusion bars relitigation of issues adjudicated in an earlier proceeding if three requirements are met:

1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated;
2) the first proceeding ended with a final judgment on the merits; and
3) the party against whom [issue preclusion] is asserted was a party or in privity with a party at the first proceeding.

*Frankford Digital Svcs. v. Kistler (In re Reynoso)*, 477 F.3d 1117, 1122 (9th Cir. 2007).

    The second and third elements are easily satisfied. After the District Court entered summary judgment in favor of the US, the parties executed the Stipulated Judgment, which was a final judgment on the merits (element two). The Debtor, which is the defendant in the instant action, was also the defendant in the District Court Action (element three).

    The first element—identity of the issues—requires more extensive discussion. Section 1141(d)(6)(A) provides that "the confirmation of a plan does not discharge a debtor that is a corporation from any debt of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit …." Section 523(a)(2)(A) provides: "A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

//

To prevail on a claim for relief under § 523(a)(2)(A), a creditor must show that:

1) the debtor made the representations;
2) that at the time he knew they were false;
3) that he made them with the intention and purpose of deceiving the creditor;
4) that the creditor relied on such representations; and
5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

*Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

In addition, "[o]mitting critical facts which a debtor has a duty to disclose may lead to a finding of fraud," provided that there is "a duty to disclose." *Daniel v. DelValle (In re Del Valle)*, 577 B.R. 789, 802 (Bankr. C.D. Cal. 2017).

<u>*1. Findings Made by the District Court in the Summary Judgment Order*</u>

The findings made by the District Court in the Summary Judgment Order that are relevant to the instant action are summarized below.

Since approximately 2009, the Debtor "has purchased public record data about individuals from data brokers." District Court Summary Judgment Order at p. 3. The Debtor uses that data to create a public profile or listing for these individuals that is accessible through its website. *Id.* Over 60 million of the profiles are flagged with a prominent red banner and a statement that the individual "DOES" have court, arrest, or criminal records. *Id.* at pp. 2–3. "The flags may not be accurate or may not be accurately matched to the profiles on the [Debtor's] website and could refer to anything from a traffic ticket or other minor infraction to a murder conviction. With respect to individuals without a criminal, arrest, or court record flag, [the Debtor] includes statements on those individuals' profiles that the individual 'may have Arrest or Criminal Records' even though [the Debtor] does not believe that to be the case." *Id.* at p. 3.

The purpose of the flags, and the other negative information on the Debtor's website, is to induce consumers to purchase a subscription from the Debtor:

> The supposedly negative information about individuals available on [the Debtor's] website alarms many people and induces them to subscribe to [the Debtor's] services. Indeed, Defendant Tinsley thought it was "f------ amazing" that so many "flags" came back from the company's data provider during a data dump in 2017, because this negative information about consumers provided "so much opportunity" for the company. Many consumers encounter [the Debtor] for the first time by seeing and becoming upset by their personal information displayed in search engine results and on MyLife.com.

*Id.*
//

The design of the Debtor's website is "likely to mislead consumers acting reasonably under the circumstances," because "[i]n effect, [the Debtor] classifies everyone as a criminal or potential criminal for reasons [the Debtor] will not disclose unless and until the consumer purchases a subscription." *Id.* at pp. 10–11. The Debtor knew that the prominent placement of misleading statements on its website would alarm or upset potential customers. It saw this as a positive because it also knew that alarmed individuals were more likely to become subscribers:

> [The Debtor's] website displays prominent red banners on over 60 million individuals' profiles, declaring that the individual "DOES" have "arrest or criminal records" or "court, arrest or criminal records." These banners or "flags" create the deceptive and misleading impression that these individuals have criminal records, even though the flags may not be accurately matched to the profiles on the [Debtor's] website and could refer to anything from a minor non-criminal traffic ticket or other minor infraction to a murder conviction.
> Moreover, with respect to the 250 million individuals without a criminal, arrest, or court record "flag" or banner, [the Debtor] includes statements on those individuals' profiles that the individual "may have Arrest or Criminal Records." [The Debtor's] assertion that 250 million people "may" have criminal records or court records creates the misleading and deceptive impression that [the Debtor] has information suggesting that such criminal or court records exist, when, in fact, [the Debtor] has absolutely no information indicating that these individuals have any such records….
> Indeed, [the Debtor] recognizes that these derogatory statements about consumers are material and induce or entice consumers to purchase [the Debtor's] services. *See* Dietert Decl., Ex. 102, p.3 (Tinsley email stating that it was "f------ amazing" that so many flags came back from LexisNexis during a data dump in 2017 because it provides "so much opportunity" for the company). Moreover, the Government has presented substantial evidence that consumers were in fact misled, distressed, and alarmed that [the Debtor] would declare or insinuate that they had criminal or court records (when many had none) as well as evidence that some consumers purchased [the Debtor's] services to determine the basis for [the Debtor's] representations.

*Id.* at p. 11.

When potential consumers contacted the Debtor to purchase a subscription to the Debtor's services, the Debtor made false representations by significantly exaggerating the capabilities of its services:

> In its marketing materials, [the Debtor] represents that it "scan[s] the internet for you," that "you'll see all the private information about you that's exposed and sold across the web, and all the places it's available", and that [the Debtor] will "even give you the ability to delete with a single click anything you don't want exposed." Similarly, [the Debtor] represents in phone calls with customers that customers will be able to remove personal information about themselves "from the original source." Although [the Debtor] has a service that assists users with removing information from certain third-party websites (i.e., the service sends a request to the third-party website on the user's behalf), [the Debtor] cannot remove information about users from the public record and admits that it "does not have the ability to *force* third party websites to remove certain

information and cannot ultimately control what information such third party websites will actually remove in response to [the Debtor's' efforts to have such information removed."

*Id.*

When consumers who had purchased a subscription telephoned the Debtor seeking a refund, the Debtor falsely represented that its subscriptions were non-refundable:

> [D]uring these retention calls, agents were instructed to advise customers that [the Debtor's] terms and conditions state that "our subscriptions are non-refundable." However, it is undisputed that MyLife gives full refunds to customers who are "irate, adamant" or who use so-called "Magic Words," such as "FTC," "Attorney General," "BBB," "lawsuit," and others.

*Id.* at p. 15.

A significant portion of the subscriptions sold by the Debtor included an "auto-renewal" or "AR" feature:

> When the trial or subscription a consumer purchased ends, the AR feature automatically renews the subscription (or "rolls over" the trial into a full subscription) and re-charges the consumer's credit card—and will continue to do so indefinitely—unless and until the consumer cancels. The AR feature has generated very significant revenue for [the Debtor]. At least in the 2016 time frame, [the Debtor's] call center's "primary intention" when receiving a customer-service call was to keep "AR on."

*Id.* at p. 5.

The Debtor's customer service agents were "instructed to 'always assume that the caller wants the AR to remain on' and to 'not question the caller about the status of the AR' and to 'not ask if they want AR disabled. Tinsley was aware of and approved of [the Debtor's] practice of not mentioning a customer's autorenewal status." *Id.* at p. 6.

Under the TSR, the Debtor had an obligation to disclose the auto-renewal feature to consumers. *See id.* at p. 11 (District Court's finding that the Debtor's failure to disclose the auto-renewal feature violated the TSR).

The Debtor improperly retained $23,589,762 in subscription revenue by "failing to disclose or misrepresenting its refund policies" and by "failing to disclose all terms and conditions" of the auto-renewal feature. *Id.* at p. 16. The Debtor wrongfully obtained $15,871,682 in subscription revenue by implementing its auto-renewal feature (also known as a negative-option feature) in a manner that violated ROSCA. *Id.* Because of the "practical overlap" between the damages caused by the Debtor's TSR violations and the damages caused by its ROSCA violations, the total damages on account of both the TSR and ROSCA violations amounted to $33,945,698.[3] As set forth in the Stipulated Judgment, the Debtor's share of the total damages caused by the wrongful conduct described above amount to $28,945,968.

---

[3] The District Court calculated this figure by reducing the damages on account of the Debtor's TSR violations by $5,515,745. *Id.* at p. 16.

*2. The Findings Made in the District Court Summary Judgment Order Preclude the Debtor from Relitigating Issues Under the First, Second, Fourth, and Fifth Elements of the § 523(a)(2)(A) Claim*

The findings made by the District Court in its Summary Judgment Order preclude the Debtor from relitigating issues under the first, second, fourth, and fifth elements of the § 523(a)(2)(A) claim, but do not preclude the Debtor from relitigating issues under the third element (intent to deceive).

With respect to the first element and second elements (the debtor knowingly made false representations), the District Court's findings establish that the Debtor created a website deliberately designed to alarm potential customers into believing that the Internet contained information stating that the potential customers were criminals, even though in most cases the Debtor did not believe this to be the case. The purpose of the website was to induce potential customers to purchase a subscription from the Debtor when they would not have otherwise done so. In marketing materials and in telephone conversations with prospective customers, the Debtor made false representations by significantly exaggerating the capabilities of its services. When dissatisfied customers sought refunds, the Debtor falsely represented that its subscriptions were nonrefundable. Finally, by neglecting to inform customers about the auto-renewal feature, as it was required to do by the TSR, the Debtor committed a fraudulent omission.

With respect to the fourth and fifth elements (creditor reliance upon the misrepresentations and damages proximately caused by such reliance), the District Court's findings establish that consumers sustained damages as a result of the Debtor's misrepresentations and/or fraudulent omissions. The only reason many consumers purchased a subscription is because the Debtor's website contained false and misleading information and the Debtor significantly exaggerated the capabilities of its services. Many consumers who purchased subscriptions incurred unwanted additional charges because they were not properly informed of the auto-renewal feature. The foregoing misconduct damaged consumers in the amount of $28,945,968.

In an attempt to create a genuine dispute as to its liability under § 523(a)(2)(A), the Debtor submits a declaration from Tinsley, its CEO. Tinsley testifies as follows:

> In connection with the conducting of Debtor's business, neither I nor the Debtor knew consumers would be misled by Debtor's practices as described in the Summary Judgment order.
> In connection with the conducting of the Debtor's business, neither I nor the Debtor intended for consumers to be misled by Debtor's practices as described in the Summary Judgment order.
> To the best of my knowledge, information and belief, the Debtor never gave false information to consumers.
> To the best of my knowledge, information and belief, the Debtor never acted with reckless disregard for the truth of information given to customers.

Tinsley Decl. [Adv. Doc. No. 40] at ¶¶ 5–8.
//

The Supreme Court has held that an affidavit containing conclusory allegations not supported by specific facts is not sufficient to defeat entry of summary judgment:

> The object of this provision [Civil Rule 56(c)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit…. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

The Ninth Circuit has similarly held that an affidavit containing only vague assertions cannot defeat entry of summary judgment. In *Sullivan v. Dollar Tree Stores*, 623 F.3d 770, 779 (9th Cir. 2010), the parties disputed whether Dollar Tree was a "successor in interest" to Factory 2-U under the Family and Medical Leave Act of 1993. *Sullivan*, 623 F.3d at 770. Critical to adjudication of the successor in interest issue was a finding as to how many personnel employed at Factory 2-U had continued to work for Dollar Tree. The court held that Plaintiff's testimony that "[m]ost of the same personnel continued to work when Dollar Tree took Factory 2-U over at my store" was too vague to create a genuine dispute as to a material fact, where Dollar Tree had provided detailed factual assertions about which employees it hired and for what purposes. *Id.* at 779.

Where, as here, the District Court has made specific findings that the Debtor (1) created a misleading website to induce consumers to purchase its services, (2) made false statements regarding the capabilities of its services in its marketing materials, and (3) fraudulently omitted information it was required to disclose to consumers regarding its auto-renewal policies, the conclusory statements set forth in the Tinsley Declaration are insufficient to create a genuine dispute of material fact with respect to the Debtor's liability under the first, second, fourth, and fifth elements of the § 523(a)(2)(A) claim.

However, the findings in the District Court Summary Judgment Order do *not* preclude the Debtor from contesting its liability under the third element of § 523(a)(2)(A)—that is, whether the Debtor made the misrepresentations with the intention and purpose of deceiving consumers. In determining that the Debtor's violations of the Consumer Protection Statutes damaged consumers in the amount of $33,945,698, the District Court noted that "[t]o obtain consumer redress, … the [US] need only prove the existence of rule violations, with no state-of-mind requirement." District Court Summary Judgment Order at p. 16. The factual findings made by the District Court certainly support the reasonable inference that when the Debtor made misrepresentations to consumers, it did so with the intent to deceive. But "making such an inference to establish intent is not proper when applying the doctrine of collateral estoppel," as the doctrine "applies only when the issues presented are identical, not merely similar." *Fed. Trade Comm'n v. Gugliuzza (In re Gugliuzza)*, 527 B.R. 370, 377 (C.D. Cal. 2015).

Faced with a similar situation, the *Gugliuzza* court held that the debtor, which in that case was an individual rather than a corporation, was *not* precluded from litigating his intent to deceive consumers. Like the Debtor here, the debtor in *Gugliuzza* had been convicted of violating § 5(a) of the FTC Act. The court held that the debtor "did not have a full and fair opportunity to litigate whether he had the intent to deceive" since proof of intent to deceive "is unnecessary to establish a violation" of § 5(a) of the FTC Act. *Id.*

*3. The Stipulated Judgment Does Not Preclude the Debtor from Contesting its Liability Under the "Intent to Deceive" Element of the § 523(a)(2)(A) Claim*

The US asserts that it is entitled to summary judgment as a result of the Stipulated Judgment, and advances two arguments in support of this contention, both of which are ultimately unavailing.

First, the US argues that the Debtor waived its right to a discharge in the Stipulated Judgment, and that the waiver is enforceable. The Ninth Circuit has held that a prepetition waiver of the discharge is unenforceable as a violation of public policy: "This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive." *Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002). *Huang* prevents the Court from enforcing the provision of the Stipulated Judgment waiving the dischargeability of the US Debt.

Second, the US contends that even if the discharge waiver is not enforceable, the Court can still rely upon the factual admissions made by the Debtor in the Stipulated Judgment. According to the US, these factual admissions preclude the Debtor from litigating its liability under § 523(a)(2)(A)—including litigating whether it intended to deceive consumers.

In *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 655 (B.A.P. 9th Cir. 1998), the court found that while a stipulated discharge waiver was unenforceable, parties were entitled to "stipulate to the underlying facts that support a finding of nondischargeability." Nonetheless, where a debtor's pre-petition stipulated admissions have clearly been drafted for the purpose of insulating the debt from discharge, it is not always appropriate for the Court to rely upon such admissions. The concern is that such pre-petition admissions are nothing more than a clever method to circumvent *Huang*'s bar on pre-petition discharge waivers. It was on the basis of this concern that the court in *Wank v. Gordon (In re Wank)*, 505 B.R. 878 (BAP 9th Cir. 2014) found that it was improper for the Bankruptcy Court to have relied upon admissions contained in a debtor's pre-petition declaration to find that the debt at issue was non-dischargeable. The *Wank* court found that it was necessary to view the debtor's pre-petition admissions "with great skepticism" given the debtor's subsequent testimony that he had made the admissions while under duress and while under the influence of anxiety medication. *Wank*, 505 B.R. at 884. The pre-petition admissions were further clouded by the fact that they were not incorporated into a stipulated judgment, but instead were contained in a declaration that had been "sealed by the parties and deposited with an escrow company, only to be opened if [the debtor] filed a bankruptcy petition …." *Id.* at 891.

Here, it is not necessary to determine whether the concerns expressed in *Wank* prevent the Court from relying upon the Debtor's admissions in the Stipulated Judgment for purposes of determining the dischargeability of the US Debt. Even if the Court could properly rely upon such admissions, the Debtor would still *not* be precluded from contesting its liability under the "intent to deceive" element. The Debtor admitted in the Stipulated Judgment that the "facts alleged in the [District Court Complaint] shall be taken as true, without further proof," in this dischargeability action. Stipulated Judgment at § VIII(B)–(C). The District Court Complaint alleged that the Debtor violated § 5(a) of the FTC Act and various rules promulgated thereunder. As discussed in Section II.B.2, above, no state-of-mind requirement is necessary to establish liability under § 5(a) of the FTC Act. Therefore, in terms of its preclusive effect with respect to the "intent to deceive" element, the Stipulated Judgment suffers from the same defects as the District Court Summary Judgment Order. That is, the issues are *not* identical given the absence of a state-of-mind requirement under § 5(a) of the FTC Act. Consequently, the Stipulated

Judgment cannot serve as an alternative basis for precluding the Debtor from contesting its liability under § 523(a)(2)(A)'s "intent to deceive" element.

### C. Litigation Deadlines

The undersigned judge will be retiring from the bench on September 30, 2023. The litigation deadlines previously ordered by the Court are **VACATED**. Litigation deadlines will be set by the judge to whom the case is reassigned.

Based upon its review of the Status Report filed on July 25, 2023 [Adv. Doc. No. 62], the Court finds that it is appropriate to order this matter to mediation. The parties shall meet and confer and select a Mediator. The parties may select either a Mediator from the District's Mediation Panel or a private Mediator. Within fifteen days from the date of the issuance of this Memorandum of Decision, the US shall lodge a completed "Request for Assignment to Mediation Program; [Proposed] Order Thereon" (*see* Amended General Order 95-01 available on the Court's website). The manner in which the mediation is conducted (whether by videoconference or in-person) shall be at the discretion of the Mediator.

### D. The Debtor's Motion to Reject the Stipulated Judgment is Denied

Section 365(a) provides that the Debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." A contract is executory if "the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." *Marcus & Millichap, Inc. v. Munple, Ltd. (In re Munple, Ltd.)*, 868 F.2d 1129, 1130 (9th Cir. 1989).

The Stipulated Judgment is *not* an executory contract. It is true that the Stipulated Judgment requires the US to refrain from enforcing the Stipulated Judgment if the Debtor makes the payments required thereunder. However, this aspect of the Stipulated Judgment is more appropriately characterized as a condition, as opposed to an obligation that could give rise to a material breach if left unperformed. As explained in *Enterprise Energy Corp. v. U.S. (In re Columbia Gas Sys. Inc.),* 50 F.3d 233, 241 (3d Cir. 1995), "if the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365 because no material breach could occur." The requirement that the US forebear from enforcing the Stipulated Judgment if the Debtor timely made the required payments is a condition, not an obligation or duty, because there would be no reason for the US to enforce the Stipulated Judgment if it were timely receiving payments.

It is also true that the Stipulated Judgment requires the US to reconvey to property to Tinsley if Tinsley makes certain payments. The fact that the Stipulated Judgment contains unperformed obligations *as to Tinsley* does not render the Stipulated Judgment executory as to the Debtor.

Because the Stipulated Judgment is *not* an executory contract, it is not subject to assumption or rejection under § 365. Accordingly, the Debtor's motion to reject the Stipulated Judgment is **DENIED**.

## III. Conclusion

Based upon the foregoing, the MSJ is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Debtor is precluded from contesting its liability under the first, second, fourth, and fifth elements of § 523(a)(2)(A), but is *not* precluded from contesting its liability under the third element of § 523(a)(2)(A) (intent to deceive). The only issue remaining for trial is whether

the misrepresentations made by the Debtor to consumers were done with an intent to deceive. In addition, the Debtor's motion to reject the Stipulated Judgment is **DENIED**.

The Court will prepare and enter orders consistent with this Memorandum of Decision.

###

Date: July 31, 2023

Ernest M. Robles
United States Bankruptcy Judge