James A. Dumas (SBN 76284)
Christian T. Kim (SBN 231017)
DUMAS & KIM, APC
915 Wilshire Boulevard, Suite 1775
Los Angeles, California 90017
Phone:   213-368-5000
Fax:      213-368-5009
Email: jdumas@dumas-law.com

Attorneys for Chapter 7 Trustee,
Carolyn A. Dye

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>MY LIFE.COM, INC.,<br><br>    Debtor. | Case No.: 2:22-BK-14858-VZ<br><br>Chapter 7<br><br>[Honorable Vincent P. Zurzolo]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE OF THE PERSONAL PROPERTY OF THE ESTATE, CONSISTING OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, FREE AND CLEAR OF INTERESTS, SUBJECT TO HIGHER AND BETTER OFFERS, AND APPROVING OVERBIDDING PROCEDURES; DECLARATIONS OF CAROLYN A. DYE, ALBERT SHILTON, GEOFFREY BARKER, AND ANTHONY MAZZARELLA IN SUPPORT THEREOF**<br><br>**Date:   April 16, 2024**<br>**Time:  10:30 a.m.**<br>**Place:  255 E. Temple Street**<br>   **Courtroom 1368**<br>   **Los Angeles, CA 90012** |

TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR, AND OTHER INTERESTED PARTIES:

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTUAL BACKGROUND

The Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code on September 2, 2022.  The Debtors case was converted from one under Chapter 11 to one under Chapter 7 on February 9, 2024, and the Trustee was appointed soon thereafter.

The Debtor operates an internet service that purchases personal data from TransUnion then uses it to create profiles of individuals that can be accessed by its users. It has non-paying registered users, who can access and confirm their own profiles and limited portions of others' profiles, and confirm or provide their email addresses, and paid subscribers who can access anyone's profile in greater depth. It has been in existence for twenty-two years and predates many companies that now provide related services, such as Facebook. While in recent years it has been by no means the largest company in its market niche, it historically generated significant revenue and at its height employed more than one hundred people. It was founded by a Jeffrey Tinsley who at all times relevant has been its CEO and the holder of at least 51% of its shares.

The major precipitating factor in the bankruptcy filing was a U.S. District Court lawsuit filed against the Debtor and Mr. Tinsley by the Department of Justice ("DOJ") on July 27, 2020, alleging that the Debtor's activities violated consumer protection statutes: the Federal Trade Commission Act (the "FTC Act"), the Telemarketing Sales Rule ("TSR"), and the Restore Online Shoppers Confidence Act ("ROSCA"). On October 19, 2021, the District Court granted summary judgment to the United States, finding that the Debtor maintained a website that was likely to mislead consumers in violation of the FTC Act, that it violated the TSR by making misleading telemarketing calls to consumers, and that it violated ROSCA by failing to provide subscribers necessary disclosures regarding the so-called "negative option" for renewals of their subscriptions.

As a consequence of this ruling, the Debtor and Tinsley entered into a stipulation that resulted in a Stipulated Order for Permanent Injunction and Equitable Monetary Relief that was entered on

December 15, 2021. See **Exhibit A** to Declaration of Carolyn A. Dye. The Stipulated Order was binding on "Defendants", defined as Tinsley, the Debtor, and the Debtor's "successors and assigns." It separately defined a "Covered Business" as any business that the "individual defendant" (i.e. Tinsley) would directly or indirectly control. The "Defendants" further agreed that the terms of the order would be non-dischargeable in any bankruptcy.

The Debtor agreed to pay $28,945,968 and a payment plan was established. Prior to the September, 2022 bankruptcy filing, the Debtor had made two payments totaling $3,166,666.66. Tinsley likewise agreed to liability for $5 million in damages secured by his real property. The Stipulated Order also barred certain practices of the Debtor and Tinsley going forward. The most consequential of these provisions was a bar against "Defendants" entering into contracts with consumers containing a so-called "negative option" provision whereby the consumers' subscriptions would be renewed in the absence of some affirmative action on their part. This terms of the order promoted the policies of the consumer protection statutes and remedied the Debtor's history of not adequately informing its customers of their right to terminate their subscriptions. However, a blanket prohibition against "negative option" subscriptions is not required by the applicable consumer protection statutes that the Debtor was found to have violated and all of the Debtor's major direct competitors, as well as a large percentage of subscription-based internet and entertainment services more generally, have "negative option" features to their subscriptions. Deprived of automatic subscription renewals, the Debtor's revenues plummeted by more than 80%, and the Debtor shrank from a company that had employed approximately sixty people just prior to the Stipulated Order to one that today has twelve employees.

From the outset, the Chapter 11 focused on the extent to which the various provisions of the Stipulated Order would survive a reorganization. For example, the Debtor argued unsuccessfully to the within Court that the order was an executory contract within the meaning of 11 U.S.C. §365 which the Debtor could simply reject. There was an issue about the Debtor's attempts to sell a valuable Domain Name free and clear of the terms of the Stipulated Order which became mired in a controversy about whether the proposed purchaser was controlled by Mr. Tinsley. The DOJ brought an adversary proceeding seeking to confirm the enforceability of the provision in the Stipulated Order

1  that made the various obligations imposed by the order non-dischargeable in any bankruptcy. That

2  adversary proceeding was not decided during the Chapter 11 and was rendered moot by the

3  conversion to Chapter 7 (because the Debtor will not receive a discharge).

4         During the Chapter 11, it further became clear that, even though the Debtor had at least

5  temporarily been relieved of the burden of making the cash payments pursuant to the Stipulated

6  Order, it would still be operating at a loss so long as it was subject to its other injunctive terms,

7  including, in particular, the prohibition against offering "negative option" subscriptions. Accordingly,

8  any "reorganization" would necessarily involve a liquidation of the company. As a practical matter,

9  this meant that there would have to be a sale of substantially all of the Debtor's assets to a third party

10 free and clear of the obligations imposed by the Stipulated Order, something that the DOJ, for its

11 part, asserted was impermissible. Among the concerns raised by the DOJ was the likelihood that any

12 sale of the Debtor as a going concern would directly or indirectly be a sale to insiders and, in

13 particular, to a person or entity controlled by Mr. Tinsley, who though rendered insolvent by the

14 Stipulated Order and still subject to it, was not himself in bankruptcy.

15        The Debtor submitted a Plan and Disclosure Statement premised on such a sale without

16 specifying the sale's terms, let alone identifying a buyer. Then, on the eve of the conversion of the

17 case to Chapter 7, it filed a motion for the sale of substantially all of its assets to a Mehran Nia for the

18 sum of $1.25 million. Although there was no issue about the fact that the money for the purchase

19 would come from Mr. Nia, it was disclosed that Mr. Tinsley would be associated with the buyer in

20 the capacity of "consultant." Mr. Nia was a former member of the Debtor's Board of Directors who

21 had had a long personal friendship with Mr. Tinsley. The motion and the proposed Plan and

22 Disclosure Statement were opposed by the DOJ on the grounds, inter alia, that a sale free and clear of

23 the terms of the Stipulated Order was not warranted and/or permissible. There was also opposition

24 from a competing proposed buyer, Shilton Investments, Inc. ("Shilton"), owned by a Mr. Albert

25 Shilton.  Shilton alleged that the Debtor had not cooperated with its attempts to explore a purchase of

26 the assets and that this made any overbidding process problematic. If Shilton were to acquire the

27 Debtor's assets, it expected to retain all or most of the employees of the Debtor and to otherwise

28 preserve the continuity of its operations. However, it had no intention of employing Mr. Tinsley and

1  it argued that that this was the apparent reason that the Debtor was not cooperating with its attempts

2  to engage in due diligence preparatory to making an offer. Albert Shilton has independently known

3  Anthony Mazzarella, the Debtor's Chief Financial Officer, but neither he nor any financial partner in

4  the proposed purchase has had any prior involvement with either the Debtor or Mr. Tinsley.

5         The controversy regarding the proposed sale to Mr. Nia and the Plan and Disclosure

6  Statement had been extensively briefed as of the February, 2024 conversion of the case to Chapter 7

7  but the Court had not made any rulings. Since the conversion the Chapter 7 trustee has obtained an

8  order authorizing her to operate the Debtor pending a renewed attempt to sell its assets. It quickly

9  became apparent to the Trustee that, although there may be some modest value to several of the

10 Debtor's domain names, the remaining assets derive their value from the ongoing operation of the

11 Debtor's business. Either substantially all of the Debtor's non-cash assets will be sold to a party that

12 will continue to operate the business with the same domain names and substantially the same

13 employees (with the likely exception of Mr. Tinsley) or the majority of the assets have no value.

14        By the within motion, the trustee is now seeking to sell substantially all of the Debtor's assets

15 to Shilton Investments, the potential overbidder at the pre-conversion stage of the case, for $1.3

16 million, $50,000 more than Mr. Nia's offer. Shilton, which is primarily a real estate investment

17 company, will assign its rights and obligations under the contract to a single purpose entity controlled

18 by Mr. Shilton and a partner, a Mr. Geoffrey Barker. Unlike Albert Shilton, Mr. Barker has some

19 experience with internet companies and like him, no prior association with Mr. Tinsley or the Debtor.

20 Mr. Barker does know  Mr. Mazzarella socially. The Buyer will have no association with Mr. Tinsley

21 going forward but it expects to hire most, if not all, of the current employees, including the two most

22 important managers at this point, Mr. Mazzarella and a David Wolfe, who is Vice-President for

23 products. Mr. Mazzarella joined the Debtor on December 28, 2018, and Mr. Wolfe in 2021, after the

24 period of "bad acting" that gave rise to the DOJ action and, with the exception of Mr. Tinsley,

25 essentially all of the managers during the period addressed in the DOJ action departed the company

26 soon after the lawsuit was filed. Mr. Mazzarella and several other employees have small

27 shareholdings in the Debtor, which in the aggregate total to approximately 5% of the Debtor's total

28 shares.

1           Other parties have expressed interest to either the Trustee or Mr. Mazzarella in buying the

2    Debtor's assets and there may be overbidders, at least some of whom contemplate a post-purchase

3    relationship with Mr. Tinsley.

4           Any buyer of the assets will obviously be subject to the provisions of the consumer protection

5    statutes whose alleged violation precipitated the District Court action against the Debtor. The issue is,

6    as it has been throughout these proceedings, whether a buyer would also be subject to the more

7    restrictive injunctive provisions of the Stipulated Order. Effectively, no party is going to purchase the

8    Debtor's assets subject to those provisions. While the trustee takes very seriously the concerns of the

9    DOJ, she has made the business judgment that a sale free and clear of the restrictions imposed by the

10    Stipulated Order is permissible and in the best interests of creditors. Among the reasons she has

11    arrived at this conclusion are that the proposed sale, as currently structured, does not contemplate any

12    further involvement by Mr. Tinsley, or by any other significant shareholder of the Debtor, or by any

13    party that was in a position of responsibility at the company at the time of the consumer protection

14    violations that gave rise to the DOJ action.

15           As to a potential overbidder who proposes to employ Mr. Tinsley in any capacity going

16    forward, the trustee expresses no opinion at this time as to whether such a sale would likewise be

17    permissible other than to note that Mr. Tinsley individually remains subject to the Stipulated Order.

18    The Trustee invites any such proposed purchaser to submit evidence and argument regarding this

19    issue in connection with any overbid.

20           Lastly, in connection with this sale motion, the trustee will be filing a motion to assume and

21    transfer its rights under its contract with its most important vendor, TransUnion, the primary supplier

22    of the data that is used for the Debtor's profiles.

23           **II.**      **TERMS OF SALE**

24           Trustee proposes to sell the assets to Shilton Investments, Inc., or its nominee, for a total

25    consideration of One Million Three Hundred Thousand Dollars ($1,300,000). Shilton has paid an

26    initial deposit of $100,000 and the sale is to close, and Buyer is to pay the balance of the purchase

27    price, fifteen days (15) days after the entry of an order approving the sale.  Shilton is prepared to

28    close sooner and, everything else being equal, the Trustee would readily agree to this. Shilton had

sought a waiver of the automatic fourteen day stay of the sale order pursuant to Bankruptcy Rules 6004 and 6006. The Trustee, declined this request, and is putting off the closing for the full fifteen days contemplated by the Rule, to give adequate time for any party seeking to appeal the sale order to obtain a stay of the sale order pending appeal. However, in the absence of the stay of the sale order by the fourteenth day after the entry of the order, the Trustee will close the sale, thereby rendering any appeal of the order moot.

Because Shilton was put to extra expense and risk by the initial failure of the Debtor to cooperate with his attempts to conduct due diligence, the Trustee has agreed to a $40,000 "break-up fee" if there is an overbid. This will simply reduce the estate's net benefit from the initial overbid (which must be in the minimum sum of $50,000) and will not serve to discourage overbidding. The sale is on an "as is - where is" basis. It is subject to Bankruptcy Court approval and the overbid process. Any overbidding will occur at the hearing set for the approval of this sale and there will be no separate auction. There are no brokers commissions that need to be paid in connection with the sale.

Attached as **Exhibit "B"** to the Dye Declaration is a true and correct copy of the APA.

1.    Overbidding Procedures.

One of the conditions of the offer is that the sale is subject to overbids. Trustee submits the following terms and conditions for the submission of overbids to purchase the assets at the hearing on the Motion.

a.    Minimum Overbids. The minimum overbid for the assets shall be $50,000 above the present offer and any subsequent overbids shall be at least $25,000 over the preceding offer.

b.    Overbid Deposit. An overbid deposit of $100,000 shall be paid two (2) business days before the first scheduled hearing on this motion. The overbid payment shall be by cashier's check payable to "Carolyn A. Dye ATF MyLife.com, Inc." **The deposit will be non-refundable if the overbid is accepted and the sale does not close within fifteen (15) days of the date on which the Order approving the sale of the Property is entered by the Court.**

c.    **Overbidders are requested to submit to the Trustee, not later than two (2) business days before the hearing on the within motion, not only the cashier's check for the**

1  **required deposit, but evidence of the ability to timely pay the balance of the purchase price and**

2  **a declaration as to whether overbidders propose involvement by Mr. Tinsley in the post-sale**

3  **company's operations and whether the overbidders have any prior connection to the Debtor or**

4  **Mr Tinsley.**  The Trustee will promptly advise any proposed overbidder of disapproval of

5  qualifications, giving the overbidder an opportunity to correct the deficiency.  Included among the

6  grounds for disqualification could be a determination by the Trustee that the Buyer would not be

7  entitled to receive the assets free and clear of the Stipulated Order or that the Buyer would be

8  unlikely to be determined to be a good faith purchaser within the meaning of 11 U.S.C. §363(m). At

9  the time of the submission of this motion, the Trustee does not believe that the mere involvement of

10  Mr. Tinsley in some capacity would be grounds for disqualification per se but information could

11  come to her attention between now and the hearing date which could change her mind. The Trustee

12  will exercise her discretion in deciding whether a party is a qualified overbidder but a party who the

13  Trustee deems to be unqualified can seek to persuade the Court to the contrary through the

14  submission of argument and evidence in pleadings and/or at the sale hearing. At the same time, even

15  if the Trustee herself deems a party to be a qualified bidder, any party in interest can seek to persuade

16  the Court to the contrary. If an overbidder is not the successful bidder at the hearing on the within

17  motion, the overbid deposit shall be refunded by the trustee within twenty-four hours of the

18  conclusion of the hearing.

19       d.    Any overbid shall be an offer to purchase the assets on a "as-is - where is" basis and

20  shall contain no conditions, contingencies or addendum in addition to those contained in the terms

21  agreed to between Trustee and Buyer and presented to this Court.

22       e.    All due diligence investigations shall be conducted prior to the sale hearing.

23       f.    At the conclusion of the hearing on the Motion, the Court shall determine the highest

24  and best offer for the assets, and the Trustee shall proceed to consummate the sale of the assets in

25  accordance with such offer to the highest bidder without further notice to creditors or hearing before

26  this Court.

27       g.    The overbidder's deposit is non-refundable in the event that Court confirms the sale

28  and, for any reason whatsoever, the overbidder fails to close the sale timely.  The overbidding party

1   will be bound by all of the terms of sale proposed in this Motion (as incorporated by reference in the

2   sales contract) except as to price, without contingencies of any kind, including financing

3   contingencies, and shall close the escrow no more than fifteen (15) business days after the entry of

4   the order approving the Motion.

5          h.      The Trustee also proposes that the Court confirm a backup buyer so that, in the event

6   that the successful bidder does not close within fifteen (15) days after the entry of the order approving

7   the Motion, the Trustee may retain the deposit of the original successful buyer as liquidated damages

8   and sell the Property to the back-up buyer for the amount of the backup bid.

9          i.      The Trustee also seeks a ruling that the party to whom the Court confirms the sale and

10  any backup buyers are good faith purchasers for purposes of 11 U.S.C. §363(m).

11         III.    **THE COURT SHOULD APPROVE THE SALE OF THE ASSETS FREE AND**

12                 **CLEAR OF ANY INTEREST IN THE PROPERTY HELD BY A THIRD PARTY**

13         The sale that the Trustee is seeking authorization for herein is pursuant to 11 U.S.C. §363(b)

14  which authorizes the Trustee to sell "property of the estate." 11 U.S.C. §363(f) provides in relevant

15  part: "The trustee may sell property under section (b)…free and clear of any interest in such property

16  of an entity other than the estate, only if – applicable non-bankruptcy law permits the sale free and

17  clear of such interest…[or] such interest is in bona fide dispute or; such entity could be compelled, in

18  a legal or equitable proceeding, to accept a money satisfaction of such interest."

19         With one exception, the Trustee is not aware of the assertion of any "interest" of "an entity

20  other than the estate" in the assets that are the subject of the APA. The apparent exception is the

21  assertion of an "interest" in the assets by the United States by reason of the Stipulated Order. The

22  Trustee says this because she is aware that the DOJ believes that the obligations imposed by the

23  Stipulated Order would be binding on a purchaser of assets from the bankruptcy estate. (This would

24  logically include the obligation to repay the $28 million in damages as well, although it appears that

25  the DOJ would only seek to enforce the injunctive provisions.)

26         The Stipulated Order is binding on "Defendants," which includes not just Tinsley and the

27  Debtor, but the Debtor's "successors and assigns." It is unclear whether the DOJ is relying on the

28  "successors and assigns" language or it believes that, even in the absence of such language, its

1  "regulatory and enforcement powers" somehow allow it to impose the restrictions on the Trustee

2  and/or a purchaser from the Trustee.

3       Obligations that are binding on "successors or assigns" have been deemed to be "interests" of

4  the party to whom the obligation is owed for purposes of section 363(f) and such obligation are

5  frequently of a regulatory character. *Ind. State Police Pension Trust v. Chrysler LLC (In re*

6  *ChryslerLLC), 576 F.3d 108 (2$^d$ Cir) (sale free and clear of debtor's liability for certain vehicle

7  defects), *vacated on other grounds,* 558 U.S. 1087 (2009); *In re Trans World Airlines, Inc.,* 322 F.3d

8  283 (3d Cir. 2003); See extensive discussions of the relevant authority on the use of 363(f) to address

9  "successors and assigns" liability of a regulatory character in the recent Central District cases of *In*

10  *re Catalina Sea Ranch, LLC* 2020 WL 1900308 (Bankr. C.D. Cal. Apr. 13, 2020) (Judge Bason) and

11  *In re Verity Health System of California, Inc.,* 2019 WL 5585007 (Bankr. C.D. Cal. Oct. 19, 2019)

12  (Judge Robles).

13       The trustee believes that the most reasonable interpretation of the "successors and assigns"

14  language in the Stipulated Order, an interpretation that is consistent with the plain meaning of the

15  language used, as well as the definition provided for "Covered Businesses," is that "successors and

16  assigns" refers either to a business directly or indirectly controlled by Mr. Tinsley or to third parties

17  who formally assume, or have been assigned, all or a relevant portion of the rights and obligations of

18  the debtor with respect to third parties.

19       Such a conception of "successors and assigns" liability is likewise consistent with California

20  law, the law which the Trustee believes governs the liability of California entities, notwithstanding

21  the fact that the Stipulated Order enforced federal consumer protection statutes. See *Fisher v. Allis-*

22  *Chalmers Corp. Prod. Liab. Tr.,* 95 Cal. App. 4th 1182, 1188 (Cal. Ct.  App. 2002). The *Fisher* case

23  does recognize "successors and assigns" liability where "the purchasing corporation is a mere

24  continuation of the seller" or "the transfer of the assets to the purchaser is for the fraudulent purpose

25  of escaping the debtor's debts." However, in looking at whether these exceptions apply California

26  courts look at whether there is "inadequate consideration" or "if one or more persons are officers,

27  directors, or shareholders" of both the selling and the acquiring entities. *Ray v. Alad Corp.,* 19 Cal. 3d

28

22, 28 (1977). There is no issue here of inadequate consideration and no evidence of an overlap between the purchaser and the officers, directors, or shareholders of the Debtor.

In any event, even if a purchaser of the assets outside of the bankruptcy would somehow be liable under the Stipulated Order by reason of the "successors and assigns" language, liability pursuant to the language simply does not survive a bankruptcy. The government's claim, according to its proof of claim (Claim No. 18) is unsecured. If a third party without notice of the Stipulated Order had obtained a judgment against the Debtor pre-petition and had recorded a judgment lien against the Debtor's assets and executed against them to satisfy its judgment, and then sold the assets to a third party, neither it nor the party to whom the assets are ultimately sold thereby become subject to the Stipulated Order. A trustee in bankruptcy succeeds to the position of such a hypothetical judgment lien creditor. 11 U.S.C. §544(a). The trustee is not a "successor or assign," and thus, when she sells estate assets, the buyer is not a "successor or assign."

Assuming, then, that the government cannot rely on the "successors and assigns," language, can it nonetheless impose the obligations of the Stipulated Order pursuant to its "regulatory and enforcement power"? Regulation and enforcement of whom or of what? If you assume that the Stipulated Order cannot bind the Trustee and any purchaser in their supposed capacity as "successors and assigns," then the regulation and enforcement power is necessarily with regard to the assets themselves. The obligations of the Stipulated Order, it is apparently being argued, pass to whomever controls the assets.

The Trustee concedes that if there were an existing court order that, for environmental or public health reasons, curtailed the use of physical property of the estate beyond what would otherwise be required by environmental or public health law, such an order would arguably nonetheless inhere in the property itself and the trustee and any proposed purchaser arguably would take the assets subject to such an order. See, *e.g., In re General Motors Corp.,* 407 B.R. 463, 508 (Bankr. S.D.N.Y. 2009), which deals with the assumption by a buyer of estate assets of environmental remediation obligations. But the emphasis is on the word "arguably." There would have to be at least an arguable case that at the point in time that the assets are being transferred there is an ongoing danger to the environment or public health that is a property of the assets themselves,

1  as opposed to there merely having been a history of past danger that was a consequence of the use to

2  which they were put by the bad actors that owned them. In the latter case, once the bad actors are out

3  of the picture, the ongoing restrictions are at best punishment for past sins for which financial

4  compensation is an appropriate substitute remedy. A repeat offender drunk driver could be the subject

5  of a court order that his car is impounded. But if he files bankruptcy a trustee should be able to sell

6  the vehicle.

7      Here we are dealing with consumer protection statutes. If the DOJ can make the case that the

8  Debtor's assets, as opposed to the parties that have historically controlled them, warrant ongoing

9  regulation beyond the restrictions imposed by the consumer protection statutes themselves, then that

10  would be one thing. However, it does not appear that the DOJ will attempt to make that case. Rather,

11  it apparently will argue that, having obtained the Stipulated Order, and in light of the broad deference

12  accorded governmental regulatory and enforcement powers, it simply has the last word.

13      The DOJ appears to be relying on authority that delineates the extent to which a bankruptcy

14  court can infringe upon the regulatory power of state and federal agencies over a bankruptcy debtor, a

15  good summary of which is provided in the 2010 New York bankruptcy case of *In re Cabrini Med.*

16  *Ctr.,* 440 B.R. 54 (S.D. N.Y. 2010). In the *Cabrini* case, the Bankruptcy Court denied a motion by a

17  debtor for an order allowing it to sell an expired license to operate an ambulance business which

18  effectively intended to put the bankruptcy court in the position of reinstating the license. The court

19  denied the motion, finding that only the New York Department of Health could reinstate the license.

20      It is submitted that the *Cabrini* case, and the related authority it discusses, are inapposite to

21  the facts of the present case. The Trustee is not seeking to either preempt the authority of the DOJ to

22  enforce consumer protection statutes or to enforce the Stipulated Order against the parties covered by

23  the order, including the Debtor. If the Debtor had an expired state or federal license to operate its

24  business, the Trustee cannot ask the Court to order reinstatement. However, we are not dealing with

25  ongoing licensing or regulatory powers but with a remedial Stipulated Order directed at a subset of

26  parties: Tinsley, the Debtor, and the Debtor's "successors and assigns."

27      It is submitted that the Court is presented with two questions: (1) whether the Trustee and any

28  purchaser are liable under the Stipulated Order in their capacities as "successors and assigns" within

the meaning of the order and applicable law; (2) whether, regardless of the answer to the first question, the DOJ's "regulatory and enforcement powers" can be used to impose the terms of the Stipulated Order on the Trustee and any purchaser.

The Court may choose to address the second question independent of its analysis of section 363(f). However, the Trustee respectfully submits that both questions present the type of situation that section 363(f) was intended to address. She is seeking an order pursuant to the statute that the proposed sale be free and clear of any asserted interest of the United States, inclusive of a claim by the government that its interest is independent of the "successors and assigns" language and arises solely out of its "regulatory and enforcement powers." She believes that such an order is permissible in the within case because, for the reasons set forth above, (1) pursuant to non-bankruptcy law, Buyer is not a "successor or assign" or, otherwise subject to the Stipulated Order, (2) there is, at a minimum, a bona fide dispute as to whether the Buyer is subject to the order, and (3) the United States can be compelled to accept a monetary interest in satisfaction of its claim.

More could be said with regard to each of these grounds but, in the absence of greater specificity on the part of the DOJ as to why it believes it can impose liability on a buyer of the assets, it is pointless to go further at this point.

Obviously, a sale free and clear of the government's interest does not mean that the buyer is free to violate consumer protection laws or that the DOJ is in any way hampered from enforcing them against the buyer. It simply means that the buyer is not inheriting certain remedial and compensatory provisions of the order which go substantially beyond the requirements of those laws.

In the absence of such a bankruptcy court order pursuant to section 363(h), the Debtor's assets will have little or no value. Obviously, no one would purchase the assets subject to the more than $25,000,000 monetary obligation imposed by the District Court's Stipulated Order. And, while discrete assets such as domain names might yield some money, no one would pay a seven figure sum to purchase substantially all of the Debtor's assets if, in doing so, the buyer would be subject to the injunctive provisions of the order.

Although the Trustee will work with the DOJ to obtain a consensual resolution of what up to now has been a blanket objection to a sale of substantially all of the Debtor's assets to a buyer who is

1  not subject to the Stipulated Order, she has to be prepared for the eventuality, not only that the DOJ

2  will vigorously oppose the sale motion, but that if the motion is granted, it will seek to appeal the

3  order. In light of this, as noted above, she is not seeking a waiver of the fourteen day (14) day stay of

4  the sale order, as the buyer had requested, in order to give the DOJ an opportunity to seek a stay

5  pending appeal. She is willing to do this in order to give the DOJ the opportunity to make its case to

6  the within Court and an appellate Court in spite of the fact that the granting of a stay would kill the

7  deal since it will not go through unless and until the buyer is certain it will not be subject to the

8  Stipulated Order and the Chapter 7 Trustee cannot continue to operate the business pending the

9  outcome of an appeal. For these reasons, if a stay is not granted within the initial fourteen days of the

10  entry of the sale order, she intends forthwith to close.

11    **IV.    THE ASSETS THAT THE TRUSTEE IS SELLING DO NOT INCLUDE ANY**

12  **INFORMATION SUBJECT TO A PUBLICLY DISCLOSED POLICY OF THE DEBTOR**

13  **PROHIBITING THE TRANSFER OF PERSONALLY IDENTIFIABLE INFORMATION**

14      11 U.S.C. §363(b) (1) provides in pertinent part that the trustee can sell property of the estate

15  "except that if the debtor in connection with offering a product or a service discloses to an individual

16  a policy prohibiting the transfer of personally identifiable information about individuals to person not

17  affiliated with the debtor and if such policy is in effect on the date of the commencement of the case,

18  then the trustee may not sell or lease personally identifiable information to any person unless (A)

19  such sale or such lease is consistent with said policy, or…" an ombudsman is brought into the case.

20      Effectively, the Debtor's entire business concerns personal information about individuals.

21  However, substantially all of that information was obtained from public records or databases of

22  publicly available information. The only information which has been provided to the Debtor by the

23  customers themselves has come from (1) registered (but non-paying) users who have provided

24  confirmation that the public information the Debtor already has, concerns them, and who have

25  confirmed and/or provided their email addresses, and (2) paid users who, in addition to the foregoing,

26  provided credit card information. As of the bankruptcy filing, there was no policy whatever in effect,

27  let alone one that was disclosed to the Debtor's customers, that prevented the transfer by the Debtor

28

1  to third parties of any of the information it had received from the customers, or that it otherwise had

2  in its possession regarding them.

3          The trustee is addressing this point out of an excess of caution because of the consistently

4  contentious character of the proceedings during the Chapter 11, and not because she believes that it

5  should be controversial.

6          **V.      THE COURT SHOULD APPROVE THE PROPOSED SALE AS BEING IN**

7          **THE BEST INTEREST OF THE ESTATE**

8          Section 363(b)(1) of the Bankruptcy Code permits a trustee to sell property of the estate other

9  than in the ordinary course of business after notice and a hearing.  The standard to be applied in

10  determining whether sales should be authorized under 11 U.S.C. §363(b)(1) is whether such sales are

11  in the best interests of the estate and the price is fair and reasonable.  See generally, In re Huntington,

12  Ltd., 654 F.2d 578 (9th Cir. 1974); In re Equity Funding Corp., 492 F.2d 793 (9th Cir. 1974); In re

13  Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal. 1985).  The trustee is given substantial discretion

14  in this regard. Id. Further, the Court has broad discretion with respect to matters under §363(b).  See

15  Big Shanty Land Corporation v. Comer Properties, Inc., 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).

16  The Trustee has marketed the assets that are the subject of this sale motion in order to create a fund

17  from which to pay general unsecured creditors and administrative expenses. Trustee believes that the

18  proposed sale is, therefore, in the best interest of the creditors of this estate.

19          Within the constraints imposed by the fact that since February the case has been in a Chapter

20  7 liquidation and that the Debtor's business only continues to operate pursuant to an extraordinary

21  order of this Court, the Trustee has investigated the potential market for the sale of the assets of the

22  Debtor. Her initial judgment is that, while there may be parties interested in purchasing some subset

23  of the assets that are the subject of this sale, no one so far has demonstrated a willingness to pay a

24  sum comparable to what is being offered by the within Buyer. She further has at least initially

25  concluded that no party would be willing to pay as much as or more than the within Buyer unless it is

26  getting substantially all of the Debtor's assets and is effectively getting a going concern. Such a buyer

27  in turn is likely to have some prior affiliation with one or more persons who already work in the

28  business and will want to retain all or a portion of the existing staff post-sale to maximize the return

1  from the purchased assets. This is the case with the principal of the within Buyer, who is a personal

2  friend of the Debtor's CFO, Anthony Mazzarella, and is also the case with one potential unnamed

3  overbidder who has contacted the Trustee through an attorney and who says that the purchaser wants

4  to employ Mr. Tinsley as a consultant.

5      Based on the Trustee's reasonable business judgment, Trustee believes that the sale to the

6  proposed Buyer and/or overbidder(s) is the highest and best available price for the Property. The sale

7  is subject to overbid.  The Purchase Price is fair and reasonable.

8  **VI.  THE BUYER IS A GOOD-FAITH PURCHASER UNDER 11 U.S.C. §363(m)**

9      The proposed sale is in good faith.  The good faith requirement focuses principally on the

10  disclosure of all material sale terms and the absence of fraud or collusion.  In re Abbotts Gary's of

11  Pennsylvania, 788 F.2d 143, 149 (3rd Cir. 1996).  See also In re Apex Oil Company, 92 B.R. 847,

12  869-71 (Bankr. E.D. Mo. 1988).  Typically, lack of good faith is shown by fraud, collusion between

13  the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

14  bidders.  Ewell v. Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir. 1992).

15      The Motion discloses all material sale terms.  Furthermore, the sale to the Buyer is being

16  consummated on an arm's-length basis and without any fraud or collusion between the purchaser and

17  other bidders, the trustee, or the company's management. To the best of Trustee's knowledge, and

18  according to the attached declaration of Anthony Mazzarella, the only connection between the

19  Buyer's principal, Albert Shilton, and the Debtor is that Mr. Mazzarella, the company's CFO and the

20  holder of approximately 3% of its shares, has been a personal friend of Mr. Shilton. The proposed

21  Buyer has no connection to the Trustee or her professionals. The within motion provides a

22  considerable degree of candid disclosure regarding the limited relationship between Mr. Mazzarella,

23  Mr. Shilton, and a Mr. Geoffrey Barker, and the commercial necessity for any buyer to employ the

24  Debtor's employees and selected managers in any post-purchase company.

25      The order should contain a finding that the Buyer is a good faith purchaser within the

26  meaning 11 U.S.C. §363(m).

27  **VII.  CONCLUSION**

28      Based on the foregoing, the Trustee respectfully requests that this Court issue an order:

1      1.     Approving the proposed sale of the Property on the terms and conditions set forth in

2  the attached Asset Purchase Agreement free and clear of any interest in the property in favor of a

3  third party pursuant to 11 U.S.C. §363(f);

4      2.     Authorizing Trustee to execute any and all documents as may be reasonable and

5  necessary to consummate the proposed sale;

6      3.     Approving the overbidding procedures as described herein;

7      4.     Finding that the proposed Buyer (or the successful overbidder) and backup buyer are

8  good-faith purchasers under 11 U.S.C. §363(m);

9      5.     Granting such other and further relief as may be just and proper.

10

11  Dated: March 26, 2024             DUMAS & KIM, APC

12

13                    By: _____

James A. Dumas, Attorneys for Chapter 7

14                        Trustee, Carolyn A. Dye

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF CAROLYN A. DYE

I, Carolyn A. Dye, declare:

1.    I am an attorney duly admitted to practice in the State of California and the United States Courts for the Central District of California.  I have personal knowledge of the facts stated herein and could and would competently testify thereto.

2.    I am the duly appointed and acting Chapter 7 Trustee for the Debtor herein MY LIFE.COM ("Debtor").

3.    I have been operating the Debtor's business since the entry of the order authorizing me to do so was entered on February 23, 2024.  In the course of these operations I have been in frequent contact with various veterans of the Debtor's operations, including the Debtor's former CEO and principal shareholder, Jeffrey Tinsley, and its current CFO, Anthony Mazzarella. Through my attorneys I have also had extensive contacts with the Debtor's most motivated creditor, the Department of Justice. I have come to be aware of prior efforts to liquidate the Debtor's assets and have drawn certain conclusions regarding what can and cannot be accomplished. I believe that a sale of some of the Debtor's domain names would yield a modest amount of money but that the remaining assets derive their value from the ongoing operation of the Debtor's business. Either substantially all of the Debtor's non-cash assets will be sold to a party that will continue to operate the business with the same domain names and substantially all of the same employees (with the possible exception of Mr. Tinsley) or the majority of the assets have no value. It is further clear that any such purchaser requires assurances that it will not be subject to the terms of the 2021 U.S. District Court Stipulated Order between the Debtor and the DOJ. This Stipulated Order is attached hereto as **Exhibit A.**

4.    By the within motion, I am seeking to sell substantially all of the Debtor's assets to Shilton Investments, Inc. pursuant to the Asset Purchase Agreement ("APA") attached hereto as **Exhibit B**.

5.    I am pressed to accomplish a sale as expeditiously as possible since operation of a business in a Chapter 7 is highly unusual and is rarely sustainable for more than a few weeks. In considering sale options I have necessarily had to turn to the small pool of potential buyers that was created during the Chapter 11 phase of the case through the independent efforts of Mr. Tinsley and

1    Mr. Mazzarella. I am aware of the identities of parties that Mr. Tinsley, in particular, regarded as

2    potential purchasers and I will attempt to contact them regarding the within proposed sale. I am aware

3    of at least one potential overbidder who has retained counsel and been in contact with me and my

4    counsel. Mr. Tinsley himself, in spite of the opposition to his continuing involvement from the DOJ,

5    remains in touch and has expressed interest in somehow presenting an overbid.

6        6.       Any buyer of the assets will obviously be subject to the provisions of the consumer

7    protection statutes whose alleged violation precipitated the District Court action against the Debtor.

8    The issue is, as has been throughout these proceedings, whether a buyer would also be subject to the

9    more restrictive injunctive provisions of the Stipulated Order. Effectively, no party is going to

10   purchase the Debtor's assets subject to those provisions. While I take very seriously the concerns of

11   the DOJ, I have made the business judgment that a sale free and clear of the restrictions imposed by

12   the Stipulated Order is permissible and in the best interests of creditors. Among the reasons I have

13   arrived at this conclusion are that the proposed sale, as currently structured, does not contemplate any

14   further involvement by Mr. Tinsley, or by any significant other shareholder of the Debtor, or by any

15   party that was in a position of responsibility at the company at the time of the consumer protection

16   violations that gave rise to the DOJ action.

17       7.       As to a potential overbidder who proposes to employ Mr. Tinsley in any capacity

18   going forward, I express no opinion at this time as to whether such a sale would likewise be

19   permissible other than to note that Mr. Tinsley individually remains subject to the Stipulated Order. I

20   invite any such proposed purchaser to submit evidence and argument regarding this issue in

21   connection with any overbid.

22       8.       To the best of my knowledge, Shilton Investments, Inc., Albert Shilton, and his

23   proposed partner, Geoffrey Barker, have no connection to me or my professionals or to the Debtor,

24   other than as disclosed in the attached Declaration of Anthony Mazzarella.  As such, the sale is an

25   arms-length transaction and I am asking for a finding that the buyer is a good faith purchaser for

26   purposes of section 363(m).  The Motion provides that this sale is subject to overbids and to the

27   approval of the Bankruptcy Court and the proposed Buyer has agreed to these conditions.

28

1      9.      Prior to the hearing on the within motion, I will have received an initial deposit of

2  $100,000 toward the purchase price, with the balance to be paid fifteen days after the entry of the

3  order approving the sale. In light of the unusual history of these proceedings and failure by the

4  Chapter 11 Debtor to cooperate with the Buyer's attempts to do due diligence, I have agreed to a

5  $40,000 "break-up fee" for the Buyer in the event that the Court ultimately determines that an

6  overbidder is entitled to complete the transaction.

7      I declare under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.

9      Executed this 25th day of March, 2024, at Los Angeles, California.

10

11

12      _____
       Carolyn A. Dye, Chapter 7 Trustee for the Estate
13     of MY LIFE.COM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

# EXHIBIT "A"



JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MYLIFE.COM, INC., a corporation,<br><br>and<br><br>JEFFREY TINSLEY, individually and as an officer of MYLIFE.COM, INC.,<br><br>Defendants. | Case No. 2:20-cv-6692-JFW (PDx)<br><br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND EQUITABLE MONETARY RELIEF** |

Plaintiff and the Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction and Equitable Monetary Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in violation of ROSCA, 15 U.S.C. § 8404, and in violation of the FCRA, 15 U.S.C. §§ 1681-1681x, in the promotion and sale of background reports.

3. Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in their answer to the Complaint.

4. Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5. Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A. **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1. In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

1       2.     A visual disclosure, by its size, contrast, location, the length of

2 time it appears, and other characteristics, must stand out from any accompanying text

3 or other visual elements so that it is easily noticed, read, and understood.

4       3.     An audible disclosure, including by telephone or streaming video,

5 must be delivered in a volume, speed, and cadence sufficient for ordinary consumers

6 to easily hear and understand it.

7       4.     In any communication using an interactive electronic medium,

8 such as the Internet or software, the disclosure must be unavoidable.

9       5.     The disclosure must use diction and syntax understandable to

10 ordinary consumers and must appear in each language in which the representation that

11 requires the disclosure appears.

12       6.     The disclosure must comply with these requirements in each

13 medium through which it is received, including all electronic devices and face-to-face

14 communications.

15       7.     The disclosure must not be contradicted or mitigated by, or

16 inconsistent with, anything else in the communication.

17    B.    **"Covered Information"** means individually identifiable information

18 from or about an individual consumer, including: (1) first and last name; (2) a physical

19 address; (3) an email address or other online contact information, such as an instant

20 messaging user identifier or a screen name; (4) a telephone number; (5) a persistent

21 identifier, such as a customer number held in a "cookie," a static Internet Protocol

22 ("IP") address, a mobile device ID, or processor serial number; (6) date of birth; (7)

23 real property information; (8) corporate affiliations and professional licenses; (9)

24 photos and videos; (10) work history; (11) sex offender status; (12) arrest records; (13)

25 bankruptcy records; (14) liens; (15) eviction records; (16) civil and criminal court

26 record information; (17) traffic tickets or citations; and (18) any information combined

27 with any of (1) through (17) above.

28    C.    **"Consumer Report"** means any written, oral, or other communication

1  of any information by a Consumer Reporting Agency bearing on a consumer's credit

2  worthiness, credit standing, credit capacity, character, general reputation, personal

3  characteristics, or mode of living which is used or expected to be used or collected in

4  whole or in part for a Permissible Purpose.

5      D.    **"Consumer Reporting Agency"** means any Person which, for monetary

6  fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part

7  in the practice of assembling or evaluating consumer credit information or other

8  information on consumers for the purpose of furnishing Consumer Reports to third

9  parties, and which uses any means or facility of interstate commerce for the purpose

10  of preparing or furnishing Consumer Reports.

11      E.    **"Covered Business"** means:  (1) Corporate Defendant; (2) any business

12  that Corporate Defendant, individually or collectively with Individual Defendant, is a

13  majority owner or controls, directly or indirectly; and (3) any business that Individual

14  Defendant, individually or collectively with Corporate Defendant, is a majority owner

15  or controls directly or indirectly.

16      F.    **"Covered Record"** means any written or oral communication that

17  includes any of the following information from or about an individual consumer: (1)

18  sex offender status; (2) arrest records; (3) bankruptcy records; (4) liens; (5) eviction

19  records; (6) civil and criminal court record information; and (7) traffic tickets or

20  citations.

21      G.    **"Defendants"** means the Individual Defendant and the Corporate

22  Defendant, individually, collectively, or in any combination.

23      1.    **"Corporate Defendant"** means MyLife.com, Inc., and its

24  successors and assigns.

25      2.    **"Individual Defendant"** means Jeffrey Tinsley.

26      H.    **"Negative Option Feature"** means, in an offer or agreement to sell or

27  provide any product or service, a provision under which the consumer's silence or

28  failure to take affirmative action to reject a product or service or to cancel the

- 3 -

1 agreement is interpreted by the seller or provider as acceptance or continuing

2 acceptance of the offer.

3     I.      **"Person"** means any individual, partnership, corporation, trust, estate,

4 cooperative, association, government or governmental subdivision or agency, or other

5 entity.

6     J.      **"Permissible Purpose"** means:

7          1.     In response to the order of a court having jurisdiction to issue such

8 an order, or a subpoena issued in connection with proceedings before a Federal grand

9 jury; or

10          2.     In accordance with the written instructions of the consumer to

11 whom it relates; or

12          3.     To a person which the Consumer Reporting Agency has reason to

13 believe:

14               a.     intends to use the information in connection with

15 a credit transaction involving the consumer on whom the information is to be

16 furnished and involving the extension of credit to, or review or collection of

17 an account of, the consumer; or

18               b.     intends to use the information for employment purposes; or

19               c.     intends to use the information in connection with the

20 underwriting of insurance involving the consumer; or

21               d.     intends to use the information in connection with a

22 determination of the consumer's eligibility for a license or other benefit granted by a

23 governmental instrumentality required by law to consider an applicant's financial

24 responsibility or status; or

25               e.     intends to use the information, as a potential investor or

26 servicer, or current insurer, in connection with a valuation of, or an assessment of the

27 credit or prepayment risks associated with, an existing credit obligation; or

28               f.     otherwise has a legitimate business need for the

1 information:

2      i.  in connection with a business transaction that is

3 initiated by the consumer; or

4      ii.  to review an account to determine whether the

5 consumer continues to meet the terms of the account; or

6     g.  executive departments and agencies in connection with the

7 issuance of government-sponsored individually-billed travel charge cards; or

8    4.  In response to a request by the head of a State or local child support

9 enforcement agency (or a State or local government official authorized by the head of

10 such an agency), if the person making the request certifies to the Consumer Reporting

11 Agency that:

12     a.  the Consumer Report is needed for the purpose of

13 establishing an individual's capacity to make child support payments, determining the

14 appropriate level of such payments, or enforcing a child support order, award,

15 agreement, or judgment;

16     b.  the parentage of the consumer for the child to which the

17 obligation relates has been established or acknowledged by the consumer in

18 accordance with State laws under which the obligation arises (if required by those

19 laws); and

20     c.  the Consumer Report will be kept confidential, will be used

21 solely for a purpose described in Definition J.4.a, and will not be used in connection

22 with any other civil, administrative, or criminal proceeding, or for any other purpose;

23 or

24    5.  To an agency administering a State plan under Section 454 of the

25 Social Security Act (42 U.S.C. § 654) for use to set an initial or modified child support

26 award; or

27    6.  To the Federal Deposit Insurance Corporation or the National

28 Credit Union Administration as part of its preparation for its appointment or as part of

1   its exercise of powers, as conservator, receiver, or liquidating agent for an insured

2   depository institution or insured credit union under the Federal Deposit Insurance Act

3   or the Federal Credit Union Act, or other applicable Federal or State law, or in

4   connection with the resolution or liquidation of a failed or failing insured depository

5   institution or insured credit union, as applicable.

6                                              **ORDER**

7                   I.       **PROHIBITED BUSINESS ACTIVITIES**

8                            **(FAIR CREDIT REPORTING ACT)**

9           IT IS ORDERED that Defendants, their officers, agents, employees, and

10  attorneys, and all other Persons in active concert or participation with any of them,

11  who receive actual notice of this Order, whether acting directly or indirectly, in

12  connection with operating as a Consumer Reporting Agency, are hereby permanently

13  restrained and enjoined from:

14          A.      Failing to maintain reasonable procedures designed to limit the

15  furnishing of Consumer Reports to Persons with Permissible Purposes to receive

16  them.  Such reasonable procedures shall require that: (1) prospective users of the

17  information identify themselves, certify the purposes for which the information is

18  sought, and certify that the information will be used for no other purpose; and that (2)

19  Defendants make a reasonable effort to verify the identity of a new prospective user

20  and the uses certified by such prospective user prior to furnishing such user a

21  Consumer Report;

22          B.      Failing to maintain reasonable procedures to assure the maximum

23  possible accuracy of the information concerning the individual about whom the report

24  relates;

25          C.      Failing to provide a notice to users (Attached hereto as Attachment A to

26  this Order) of such Person's responsibilities under the FCRA; and

27          D.      Furnishing a Consumer Report to any Person whom Defendants do not

28  have reason to believe has a Permissible Purpose to receive the Consumer Report.

- 6 -

## II.    FAIR CREDIT REPORTING ACT MONITORING PROGRAM

IT IS FURTHER ORDERED that each Covered Business must not advertise, market, promote, or offer for sale any Covered Information unless it first establishes and implements, and thereafter maintains, a comprehensive monitoring program to regularly review, assess, and determine the applicability of the FCRA to the business practices of the Covered Business, and if the FCRA applies to those business practices, to regularly review, assess, and determine whether they comply with the requirements of the FCRA as required by the statute and Section I of this Order (hereinafter, the "Monitoring Program"). To satisfy this requirement, each Covered Business must, at a minimum:

A.    Document in writing the content, implementation, and maintenance of the Monitoring Program;

B.    Designate a qualified employee or employees to coordinate and be responsible for the Monitoring Program;

C.    Assess and document, prior to the inception of the Monitoring Program and at least once every twelve (12) months thereafter, whether the Covered Information promoted or offered for sale by the Covered Business is a Consumer Report, and whether the Covered Business is acting as a Consumer Reporting Agency. Such assessment shall include, at a minimum, a review of:

1.    All products and services offered or sold;

2.    Marketing and advertising materials used to offer or sell those products and services (including but not limited to any advertisements, blog posts, testimonials, published statements, customer service scripts, and any method or device used to direct Persons to a website);

3.    Any measures to prevent users from using a Covered Business' products or services for purposes governed by the FCRA (e.g., disclaimers, certifications, account terminations, blocking); and

4.    Any information about how users of those products or services use,

intend to use, or expect to use those products or services (including but not limited to consumer correspondence, consumer complaints, and consumer testimonials);

D.    Design, implement, maintain, and document safeguards to assure FCRA compliance. Such safeguards must include, at a minimum:

1.    Training of all officers, employees, agents, and independent contractors, at onboarding and at least every twelve (12) months thereafter, on the FCRA's legal requirements and activities that would violate those requirements;

2.    Refraining from advertising, marketing, promoting, describing, or offering for sale any product or service that involves Covered Information as suitable or appropriate for any Permissible Purpose, unless the requirements of the FCRA and this Order that would apply to a Consumer Report are satisfied as to that product or service;

3.    Prepublication review of all marketing and advertising materials used to offer or sell those products and services (including but not limited to any advertisements, blog posts, testimonials, published statements, customer service scripts, and any method or device used to direct Persons to a website);

4.    Clearly and Conspicuously disclosing permissible and impermissible uses of any Covered Information under the FCRA and this Order prior to providing or disclosing such information;

5.    Procedures to onboard users, including requiring users to agree to contracts or terms and conditions governing FCRA compliance and Clear and Conspicuous disclosure of such terms and conditions;

6.    User access controls, such as controls on the number of Covered Records obtained per day; and

7.    Ongoing reviews, tests, or audits of the ways that users use or expect to use that Covered Business' products or services;

E.    Evaluate and adjust the Monitoring Program in light of any changes to the business' operations or business arrangements, or any other circumstance that the

- 8 -

1  business knows or has reason to know may materially affect the Monitoring Program's

2  effectiveness.  At a minimum, each Covered Business must evaluate the Monitoring

3  Program every twelve (12) months and implement modifications based on the results;

4  and

5       F.    At least once every twelve (12) months, provide (1) the written program

6  required by Subsection II.A and any evaluations thereof or updates thereto, and (2) the

7  assessments and documentation required by Subsection II.C to the Covered Business's

8  board of directors or governing body or, if no such board or equivalent governing body

9  exists, to a senior officer responsible for regulatory compliance.

10  ### III.    PROHIBITION AGAINST MISREPRESENTATIONS TO

11  ### CONSUMERS

12      IT IS FURTHER ORDERED that Defendants, their officers, agents,

13  employees, and attorneys, and all other Persons in active concert or participation with

14  any of them, who receive actual notice of this Order, whether acting directly or

15  indirectly, in connection with advertising, marketing, promoting, or offering any

16  product or service, are permanently restrained and enjoined from misrepresenting,

17  expressly or by implication:

18      A.    What a user can do or achieve with the service;

19      B.    Payment, renewal, cancellation, or refund terms relating to the product

20  or service;

21      C.    Policies or practices regarding payments, renewals, cancellation, or

22  refunds;

23      D.    The extent to which, or the probability that any consumer may have

24  Covered Records; and

25      E.    Any other fact that is material to users concerning Covered Records or

26  any of the information therein, such as any material aspect of their accuracy, nature,

27  or characteristics; or any material restrictions, limitations, or conditions on users'

28  ability to access, alter, use, correct, or delete them.

## IV.    PROHIBITION AGAINST UNSUBSTANTIATED RESPRESENTATIONS REGARDING COVERED RECORDS

IT IS FURTHER ORDERED that Defendants, their officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with advertising, marketing, promoting, or offering any product or service, are permanently restrained and enjoined from stating, directly or by implication, that:

    A.    A consumer may have or does have Covered Records;

    B.    Defendants have found Covered Records; or

    C.    There are possible or probable Covered Records;

unless the representation is non-misleading, and, at the time of making such representation, Defendants have found a Covered Record about that consumer from a third-party source.

## V.    PROHIBITION AGAINST STATEMENTS REGARDING TRAFFIC TICKETS

IT IS FURTHER ORDERED that Defendants, their officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with advertising, marketing, promoting, or offering any product or service, are permanently restrained and enjoined from stating, directly or by implication, that a traffic ticket or a traffic citation is a criminal or arrest record. Provided, however, that this provision does not preclude Defendants from stating that they received information from a third-party on a specific date that indicates that court records may exist relating to the subject of the search.

## VI.    BAN ON NEGATIVE OPTIONS

IT IS FURTHER ORDERED that Defendants, whether directly or through an intermediary, are permanently restrained and enjoined from advertising, marketing,

promoting, or offering for sale any product or service with a Negative Option Feature.

## VII. MONETARY JUDGMENTS AND PARTIAL SUSPENSIONS

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of Twenty-Eight Million Nine Hundred Forty-Five, Nine Hundred Sixty-Eight Dollars ($28,945,968) is entered in favor of the Plaintiff against Corporate Defendant, as monetary relief.

B.      Judgment in the amount of Five Million Dollars ($5,000,000) is entered in favor of the Plaintiff against Individual Defendant, as monetary relief.

C.      Corporate Defendant is ordered to pay to Plaintiff, by making total payment to the Treasurer of the United States, Sixteen Million Dollars ($16,000,000), as follows:

1.      Corporate Defendant must pay Two Million Dollars ($2,000,000) to Plaintiff on or before January 15, 2022.

2.      Corporate Defendant must pay two (2) additional discrete payments of One Million, One Hundred Sixty-Six Thousand, One Hundred and Sixty-Six Dollars and sixty-six cents ($1,166,666.66) each, on or before each of the following dates:

    a.      June 30, 2022; and

    b.      September 30, 2022;

3.      Corporate Defendant must pay one One (1) additional discrete payment of One Million, One Hundred Sixty-Six Thousand, One Hundred and Sixty-Six Dollars and sixty-eight cents ($1,166,666.68), on or before December 31, 2022;

4.      Corporate Defendant must pay twelve (12) additional discrete payments of Eight Hundred and Seventy-Five Thousand Dollars ($875,000) each, on or before each of the following dates:

    a.      March 31, 2023;

    b.      June 30, 2023;

- 11 -

c.    September 30, 2023;

d.    December 31, 2023;

e.    March 31, 2024;

f.    June 30, 2024;

g.    September 30, 2024;

h.    December 31, 2024;

i.    March 31, 2025;

j.    June 30, 2025;

k.    September 30, 2025; and

l.    December 31, 2025.

5.    All such payments must be made by electric fund transfer in accordance with instructions provided by a representative of the Plaintiff.  Written confirmation of each wire transfer shall be delivered via email to Zachary A. Dietert, Trial Attorney, Consumer Protection Branch, U.S. Department of Justice, 450 5th Street, N.W. Suite 6400-South, Washington, DC 20530, Zachary.A.Dietert @usdoj.gov.  The wire transfer transmittal shall include the title of this litigation and a reference to DJ #102-4025.

6.    Upon such total payments, the remainder of the Corporate Defendant's judgment is suspended, subject to Subsection VII.J below.

7.    Corporate Defendant may prepay at any time, and without penalty, the remaining balance, or any part thereof, of the Sixteen Million Dollars ($16,000,000) owed under this Order.  Any such prepayment made prior to an installment due date shall be credited as if made on the next installment due date, and Corporate Defendant shall be relieved of making any further payments on the installment due date for any prepayments to the extent of such prepayment.  Nothing herein shall be construed to relieve Corporate Defendant of its obligation to make timely payment for any installments as they become due, which have not otherwise fully been paid in advance.

8.      Until such time that the total amount of Sixteen Million Dollars ($16,000,000) is paid in full, Corporate Defendant is prohibited from paying any dividends to any shareholders and is prohibited from increasing the salary or paying bonuses or other form of financial compensation to any of Corporate Defendant's employees who were paid or to be paid an annual salary of $100,000.00 or more for the years 2016 to the present, other than through annual Cost-of-Living Adjustments at the rate approved by the Social Security Administration.

D.      Individual Defendant is ordered to pay to Plaintiff, by making total payment to the Treasurer of the United States, Five Million Dollars ($5,000,000), as follows:

1.      Individual Defendant shall pay Three Hundred Thousand Dollars ($300,000) to Plaintiff no later than December 15, 2021.

2.      Individual Defendant shall pay sixteen (16) additional discrete payments of Two Hundred Ninety-Three Thousand, Seven Hundred and Fifty Dollars ($293,750) each, on or before each of the following dates:

| | |
|---|---|
| a. | March 31, 2022; |
| b. | June 30, 2022; |
| c. | September 30, 2022; |
| d. | December 31, 2022; |
| e. | March 31, 2023; |
| f. | June 30, 2023; |
| g. | September 30, 2023; |
| h. | December 31, 2023; |
| i. | March 31, 2024; |
| j. | June 30, 2024; |
| k. | September 30, 2024; |
| l. | December 31, 2024; |
| m. | March 31, 2025; |

STIPULATED ORDER FOR PERMANENT INJUNCTION AND EQUITABLE MONETARY RELIEF
CASE NO. 2:20-CV-6692-JFW (PDx)

n.    June 30, 2025;

o.    September 30, 2025; and

p.    December 31, 2025.

3.    All such payments must be made by electric fund transfer in accordance with instructions provided by a representative of the Plaintiff. Written confirmation of each wire transfer shall be delivered via email to Zachary A. Dietert, Trial Attorney, Consumer Protection Branch, U.S. Department of Justice, 450 5th Street, N.W. Suite 6400-South, Washington, DC 20530, Zachary.A.Dietert @usdoj.gov. The wire transfer transmittal shall include the title of this litigation and a reference to DJ #102-4025.

4.    To secure the payment obligation under Subsection VII.D.2, above, Individual Defendant grants the Plaintiff a security interest in certain property located at 85 Crestview Ave, Camarillo, CA 93010, and proceeds thereof (hereinafter, the "Collateral"), as set forth in the Deed of Trust attached hereto as Attachment B (hereinafter, "Deed"). Individual Defendant shall do all things necessary to implement and comply with its obligations in this Order. Individual Defendant represents and acknowledges that the Plaintiff is relying on the material representations that Individual Defendant is the sole owner in fee simple of the Collateral, that title to the Collateral is marketable, and that the Collateral currently is not encumbered by any other lien, mortgage, deed of trust, assignment, pledge, security interest, or other interest except as previously disclosed to the Commission. Individual Defendant represents that none of the encumbrances on the Collateral is in default.

5.    Individual Defendant further agrees that, as of the date on which they sign this Order, they shall refrain from transferring, converting, encumbering (including encumbering by failing to pay any taxes or assessments), selling, assigning, or otherwise disposing of the Collateral, except with the express prior written permission of counsel for the Plaintiff and for the purpose of satisfying Individual

- 14 -

1  Defendant's obligation in Subsections VII.D.1-2, above, and the proceeds of any such

2  transaction shall be paid at settlement to the Plaintiff, **_provided, however,_** that this

3  limitation shall end with the completion of all payments listed in Subsections VII.D.1-

4  2, above.

5     6. Individual Defendant hereby releases and waives any statutory,

6  common law, or other homestead exemption that may apply to the Collateral for

7  purposes of the security interest granted to the Plaintiff, **_provided, however,_** that this

8  release and waiver shall end with the completion of all payments listed in Subsections

9  VII.D.1-2, above.

10     7. Individual Defendant shall cooperate fully with the Plaintiff and

11  be responsible for preparing, executing, and recording the necessary documents and

12  doing whatever else is reasonably necessary or desirable to perfect, evidence, and

13  effectuate the Plaintiff's liens, security interests, and other protections granted herein.

14  Individual Defendant shall submit to the clerk's office for recording all security

15  documents used to perfect the Plaintiff's lien on the Collateral within fourteen (14)

16  days after entry of this Order, and shall deliver to the Plaintiff copies of such officially

17  recorded documents and a statement showing the outstanding balance owed on any

18  preexisting security deeds as of the date of entry of this Order within seven (7) days

19  after receipt of such documents.

20     8. Individual Defendant may prepay at any time, and without penalty,

21  the remaining balance, or any part thereof, of the $5 million ($5,000,000.00) owed

22  under this Order.  Any such prepayment made prior to an installment due date shall

23  be credited as if made on the next installment due date, and Individual Defendant shall

24  be relieved of making any further payments on the installment due date for any

25  prepayments to the extent of such prepayment.  Nothing herein shall be construed to

26  relieve Individual Defendant of its obligation to make timely payment for any

27  installments as they become due, which have not otherwise fully been paid in advance.

28     9. Until such time that the total amount of Sixteen Million Dollars

1    ($16,000,000) is paid by Corporate Defendant in full, Individual Defendant is
2    prohibited from receiving any dividends from Corporate Defendant.

3         E.    In the event that Individual Defendant fails to make the required
4    payments when due under Subsections VII.D.1-2 of this Order, or the Plaintiff is not
5    allowed to retain any such payment, or if Individual Defendant fails to comply with
6    any part of Section VII.D of this Order and such failure is not timely cured within
7    five (5) business days:

8              1.    The entire judgment amount in Subsection VII.B, less any amount
9    previously paid, shall immediately become due and payable by Individual Defendant.
10   Interest computed at the rate prescribed under 28 U.S.C. § 1961, as amended, shall
11   immediately begin to accrue on the unpaid balance.  Time is of the essence for the
12   payments specified in this Section; and

13             2.    The Individual Defendant consents to the appointment of a
14   receiver by the Court for purpose of taking possession and control of and liquidating
15   the Collateral, with the rights and powers, and privileges of an equity receiver.  The
16   costs and expenses of the receivership, including reasonable compensation for the
17   receiver and personnel retained by the receiver, shall be paid solely from the proceeds
18   of the Collateral.  The Plaintiff and Individual Defendant waive the requirements of
19   28 U.S.C. § 2001 and 28 U.S.C. § 2004 in connection with any pending or
20   contemplated sale by the receiver.

21        F.    Upon full payment of their obligations under Subsection VII.D.2 of this
22   Order and a subsequent written request by Individual Defendant, the Plaintiff agrees
23   to reconvey or release the Deed within a reasonable time.  Individual Defendant shall
24   prepare and provide to the Plaintiff any documents required to reconvey or release
25   the Deed, and shall be responsible for recording the necessary documents and doing
26   whatever else is reasonably necessary or desirable to perfect, evidence, and
27   effectuate the Plaintiff's reconveyance or release, and shall pay all of the fees and
28   costs related to such reconveyance or release, including filing fees. In addition, the

- 16 -

Plaintiff shall promptly cancel the Deed to the extent necessary to facilitate the sale or encumbrance of the Collateral if the funds owed to the Plaintiff pursuant to Subsections VII.D.1-2 of this Order are remitted directly to the Plaintiff from the proceeds of such sale or encumbrance immediately upon closing of such sale or encumbrance.

G.    If, upon motion of the Plaintiff, a Court determines that Individual Defendant made a material misrepresentation or omitted material information concerning ownership or authority to pledge the Collateral, any encumbrance of the Collateral, or the value of the Collateral, the entire Judgment amount in Subsection VII.B, above (which the Individual Defendant stipulates only for purposes of this Section represents the consumer injury alleged in the Complaint), less any amounts previously paid by Individual Defendant, shall immediately become due and payable by him. Interest computed at the rate prescribed under 28 U.S.C. § 1961, as amended, shall immediately begin to accrue on the unpaid balance.

***Provided*** that proceedings instituted under this provision would be in addition to, and not in lieu of, any other remedies, as may be provided by law, including but not limited to, contempt proceedings or any other proceedings that the Commission may initiate to enforce this Order.

H.    The Commission's and Plaintiff's agreement to this Order is expressly based on the material representations that Individual Defendant has the right and authority to enter into the Deed, and that such Collateral is not encumbered by any lien, assignment, security interest, or other interest not otherwise disclosed in the Deed or Financial Disclosures previously made to the Commission.

I.    The Commission's and Plaintiff's agreement to the installment plans described above in Subsections VII.C and VII.D and the suspension of part of Corporate Defendant's judgment is expressly premised upon the truthfulness, accuracy, and completeness of Defendants' sworn financial statements and related

- 17 -

1 documents (collectively, "financial representations" ) submitted to the Commission,
2 namely:

3      1.    The Financial Statement of Corporate Defendant signed on
4 October 24, 2019, including the attachments;

5      2.    The additional information and documentation submitted by
6 secure file transfer protocol from Corporate Defendants' counsel at DLA Piper to
7 Commission counsel dated October 31, 2019 and November 14, 2019, attaching
8 additional financial records and supplements to Corporate Defendant's Financial
9 Statement listed above;

10      3.    The Financial Statement of Individual Defendant signed on
11 January 17, 2020, including the attachments;

12      4.    The additional information and documentation submitted by
13 e-mail and secure file transfer protocol from Individual Defendants' counsel, Joseph
14 Jay, to Commission counsel dated January 24, 2020, attaching supplements to
15 Individual Defendant's Financial Statement listed above;

16      5.    The Revised Financial Statement of Individual Defendant signed
17 on January 25, 2020, including the attachments;

18      6.    The additional information, documentation, and financial records
19 listed in Defendants' counsels' letter to Andrea V. Arias, Jamie E. Hine, and Brian C.
20 Berggren of the Division of Privacy and Identity Protection, Bureau of Consumer
21 Protection, Federal Trade Commission, dated May 17, 2020, including the
22 attachments thereto;

23      7.    Corporate Defendant's sworn testimony during the Fed. R. Civ. P.
24 30(b)(6) deposition of Corporate Defendant in this case, the documents that Corporate
25 Defendant produced to Plaintiff on the date of that deposition, Individual Defendant's
26 sworn testimony during his deposition in this case; and

27      8.    The additional information, documentation, and financial records
28 Defendants provided to Plaintiff between October 25, 2021 and November 2, 2021.

J.     The suspension of the judgment will be lifted as to Corporate Defendant if upon motion by the Plaintiff, the Court finds that any Defendant failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the deposition testimony, produced documents, or sworn statements and related documents identified in the paragraph above. If the suspension of the judgment is lifted, the judgment becomes immediately due as to that Defendant in the amount specified in Subsection VII.A above, which the parties stipulate, for the purposes of this Section only, represents the consumer injury determined by the Court in the Order at ECF No. 179, less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

## VIII. <u>ADDITIONAL MONETARY PROVISIONS</u>

IT IS FURTHER ORDERED that:

A.     Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.     The facts alleged in the Complaint shall be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.     The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.     Defendants acknowledge that their Taxpayer Identification Number (Social Security Numbers or Employer Identification Number), which Defendants must submit to the Plaintiff, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

E.      All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief, including consumer redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint.  Any money not used for such relief is to be deposited to the U.S. Treasury as disgorgement.  Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Section.

F.      Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from directly or indirectly failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. Defendants represent that they have provided this redress information to the Commission.    If a representative of the Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within fourteen (14) days.

## IX.    **CUSTOMER INFORMATION**

IT IS FURTHER ORDERED that Defendants, their officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from directly or indirectly:

A.      Failing to provide within fourteen (14) days of the entry of the Order, in a sortable format such as an Excel spreadsheet or its equivalent, the following MyLife customer information for the period from November 1, 2016 to October 31,

2021: first and last name, telephone number, email address, mailing address, subscription type, subscription duration, total paid, refund/chargebacks (if applicable), and a unique customer ID sufficient to identify multiple subscriptions for the same customer; and

B.    Disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, Social Security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with the advertising, marketing, promoting, offering for sale, or selling Covered Records or Covered Information.  Provided, however, that Defendants may use customer information for any current customer if Defendants comply with Sections I through VI of this Order.

## X.    ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A.    Each Defendant, within seven (7) days of entry of this Order, must submit to Plaintiff and the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.    For twenty (20) years after entry of this Order, Individual Defendant for any business that Individual Defendant, individually or collectively with Corporate Defendant, is the majority owner or controls directly or indirectly, and Corporate Defendant must deliver a copy of this Order to:  (1) all of each such business's principals, officers, directors, and LLC managers and members; (2) all of each such business's employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; (3) any business entity resulting from any change in structure as set forth in Section XI titled Compliance Reporting; and (4) any third party from whom any Defendant obtains Covered Information.

- 21 -

1   Delivery must occur within seven (7) days of entry of this Order for current personnel.

2   For all others, delivery must occur before they assume their responsibilities.

3         C.     From each individual or entity to which a Defendant delivered a copy of

4   this Order, that Defendant must obtain, within thirty (30) days, a signed and dated

5   acknowledgment of receipt of this Order.

6                   **XI.   <u>COMPLIANCE REPORTING</u>**

7       IT IS FURTHER ORDERED that Defendants make timely submissions to the

8   Commission:

9         A.     One year after entry of this Order, each Defendant must submit a

10   compliance report, sworn under penalty of perjury:

11           1.     Each Defendant must:  (a) identify the primary physical, postal,

12   and email address and telephone number, as designated points of contact that

13   representatives of the Commission and Plaintiff may use to communicate with

14   Defendant; (b) identify all of that Defendant's businesses by all of their names,

15   telephone numbers, and physical, postal, email, and Internet addresses; (c) describe

16   the activities of each business, including but not limited to a description of any

17   products or services that involve Covered Information, and the involvement of any

18   other Defendant; (d) describe in detail whether and how that Defendant is in

19   compliance with each Section of this Order; and (e) provide a copy of each Order

20   Acknowledgment obtained pursuant to this Order, unless previously submitted to the

21   Commission.

22           2.     Additionally, Individual Defendant must:  (a) identify all of his

23   telephone numbers and all physical, postal, email and Internet addresses, including all

24   residences; (b) identify all businesses in which he has involvement or an interest,

25   including any business for which the Individual Defendant performs services whether

26   as an employee or otherwise and any entity in which such Defendant has any

27   ownership interest; and (c) describe in detail the Individual Defendant's involvement

28   in each such business, including title, role, responsibilities, participation, authority,

1   control, and any ownership.

2       B.      For twenty (20) years after entry of this Order, each Defendant must

3   submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days

4   of any change in the following:

5           1.      Each Defendant must report any change in:  (a) any designated

6   point of contact; or (b) the structure of any Corporate Defendant or any entity that

7   Defendant has any ownership interest in or controls directly or indirectly that may

8   affect compliance obligations arising under this Order, including:  creation, merger,

9   sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in

10  any acts or practices subject to this Order.

11          2.      Additionally, Individual Defendant must report any change in:  (a)

12  name, including aliases or fictitious name, or residence address; or (b) title or role in

13  any business activity, including any business for which Individual Defendant performs

14  services whether as an employee or otherwise and any entity in which Individual

15  Defendant has any ownership interest, and identify the name, physical address, and

16  any Internet address of the business or entity.

17      C.      Each Defendant must submit to the Commission notice of the filing of

18  any bankruptcy petition, insolvency proceeding, or similar proceeding by or against

19  such Defendant within fourteen (14) days of its filing.

20      D.      One year after entry of this Order, and each year thereafter for a period

21  of twenty (20) years from entry of this Order, each Defendant must submit to the

22  Commission all documentation required under Subsection II.C of this Order.

23      E.      Any submission to the Commission required by this Order to be sworn

24  under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746,

25  such as by concluding:  "I declare under penalty of perjury under the laws of the

26  United States of America that the foregoing is true and correct.  Executed on: _____"

27  and supplying the date, signatory's full name, title (if applicable), and signature.

28      F.      Unless otherwise directed by a Commission representative in writing, all

submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "United States v. MyLife.com, Inc. and Jeffrey Tinsley."

## XII. RECORDKEEPING

IT IS FURTHER ORDERED that Defendants must create certain records for twenty (20) years after entry of the Order, and retain each such record for five (5) years. Specifically, Defendants must create and retain the following records:

A.    Accounting records showing the revenues generated from all products or services sold, and the disbursement of such revenues;

B.    Personnel records showing, for each Person providing services, whether as an employee or otherwise, that Person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.    Customer files containing the names, addresses, telephone numbers, dollar amounts paid, quantity of products or services purchased, and description of products or services purchased, to the extent such information is obtained in the ordinary course of business;

D.    Records of all complaints and refund requests concerning the subject matter of the Order, whether received directly or indirectly, such as through a third party, and any response to those complaints or requests;

E.    All sales or customer service scripts, form letters or emails, advertisements, or other marketing materials;

F.    All employee manuals and training materials concerning the subject matter of the Order;

G.    All records necessary to demonstrate full compliance with each Section of this Order.

## XIII.  ANNUAL CERTIFICATIONS

IT IS FURTHER ORDERED that:

A.     One year after the issuance date of this Order, and each year thereafter, for any Covered Business that Individual Defendant is a majority owner or controls, directly or indirectly, Individual Defendant must provide the Commission with a certification that: (1) the Covered Business has established, implemented, and maintained the requirements of this Order; and (2) Individual Defendant is not aware of any material noncompliance that has not been (a) corrected or (b) disclosed to the Commission.  The certification must be based on the personal knowledge of the Individual Defendant, or subject-matter experts upon whom the Individual Defendant relies in making the representation.

B.     One year after issuance date of this Order, and each year thereafter, Corporate Defendant must provide the Commission with a certification from a senior officer or manager that:  (1) Corporate Defendant has established, implemented, and maintained the requirements of this Order; and (2) Corporate Defendant is not aware of any material noncompliance that has not been (a) corrected or (b) disclosed to the Commission.  The certification must be based on the personal knowledge of the senior officer or manager, or subject-matter experts upon whom the senior corporate manager or senior officer reasonably relies in making the certification.

C.     Unless otherwise directed by a Commission representative in writing, submit all annual certifications to the Commission pursuant to this Order via email to DEBrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to Associate Director of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.  The subject line must begin: "United States v. MyLife.com, Inc. and Jeffrey Tinsley."

## XIV.  COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order:

A.     Within fourteen (14) days of receipt of a written request from a representative of the Commission or Plaintiff, each Defendant must:    submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission and Plaintiff are also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including remote video or telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.     For matters concerning this Order, the Commission and Plaintiff are authorized to communicate directly with each Defendant.  Defendant must permit representatives of the Commission and Plaintiff to interview any employee or other Person affiliated with any Defendant who has agreed to such an interview.  The Person interviewed may have counsel present.

C.     The Commission and Plaintiff may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XV.  RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**IT IS SO ORDERED** this 15th day of December, 2021.

Hon. John F. Walter

UNITED STATES DISTRICT JUDGE

- 26 -

# EXHIBIT "B"

# EXHIBIT "B"

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made as of March 26, 2024 ("Effective Date"), by and between Shilton Investments, Inc. ("Shilton"), a corporation incorporated under the laws of the state of California, and/or its permitted designee(s) ("Buyer"), on the one hand, and Carolyn A. Dye, as Chapter 7 Bankruptcy Trustee ("Seller") for Mylife.com, Inc., a C corporation incorporated under the laws of the state of Delaware ("Debtor"). Capitalized terms used in this Agreement are defined in this Agreement and/or in **Exhibit A** attached hereto and incorporated as if fully set forth herein.  Buyer and Seller are collectively referred to herein as the "Parties" and each individually as a "Party".

## RECITALS

WHEREAS, Debtor is a provider of background checking services (collectively, the "Business");

WHEREAS, on September 2, 2022, ("Petition Date"), the Debtor filed a voluntary petition under title 11 of Chapter 11 of the the United States Bankruptcy Code, ("Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Court") commencing case no. 2:22-bk-14858-VZ ("Bankruptcy Case").  On February 9, 2024, the Bankruptcy Case was converted to Chapter 7 of the Bankruptcy Code and Carolyn A. Dye was appointed Chapter 7 trustee.

WHEREAS, upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code, Seller and Buyer wish to enter into this Agreement, pursuant to which Seller agrees to sell to Buyer, and Buyer agrees to buy from Seller, the Purchased Assets in exchange for the payment to Seller of the Purchase Price; and

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, and intending to be bound hereby, the Parties hereby agree as follows:

## ARTICLE I

## ASSETS BEING PURCHASED; ASSUMPTION OF LIABILITIES

1.1     **Purchased Assets.**  On the Closing Date the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer and assign to the Buyer, the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances pursuant to Section 363(f) of the Bankruptcy Code, subject to the terms and conditions of this Agreement.

**1.2**      The Purchased Assets include substantially all of the non-cash assets of Debtor, whether or not specifically identified below or on one (1) or more schedules attached to this Agreement, including, without limitation, all of Debtor's right, title and interest (if any at all) in and to the following:

(a)      to the extent transferable, supplies, computers, computer systems, software and hardware, security systems and equipment, licenses and access credentials and keys, printers, equipment, furniture, fixtures and other similar assets or tangible personal property used by Debtor in the Business and under the control of Debtor;

(b)      Debtor's rights under any non-executory agreements, contracts, licenses, instruments, commitments and understandings with Debtor's suppliers, vendors and customers (written or oral) and any executory contracts for which the Bankruptcy Court approves assignment and assumption to Buyer;

(c)      copies of all of the Debtor's books and records directly related to, or used in connection with, the conduct of the Business or pertaining to the Purchased Assets, regardless of the medium on which such information is stored or maintained including, without limitation, all customer and employment records, all customer lists, all vendor information and contracts, all business plans and strategies, all financial and operational data and reports, and all marketing information and materials;

(d)      to the extent transferable, Debtor's licenses, permits or other authorizations of governmental or regulatory entities that are required under any Laws applicable to or required in connection with the Business;

(e)      Debtor's leased real property, including any leasehold improvements thereon;

(f)      Debtor's inventory;

(g)      Debtor's Intellectual Property Rights;

(h)      To the extent transferable, Debtor's insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Obligations (as defined herein) prior to the Closing Date;

(i)      Debtor's claims against third parties relating solely to the Purchased Assets, whether choate or inchoate, known or unknown, contingent or non-contingent, matured or unmatured;

(j)      Debtor's claims against all of its current or former employees, other than Jeffrey Tinsley, whether choate or inchoate, known or unknown, contingent or non-contingent, matured or unmatured;

(k)      Customer lists and contact information; and

(l)      All goodwill and any other intangible assets associated with the Business and the Purchased Assets.

**1.3      Excluded Assets.**  Anything to the contrary contained herein notwithstanding, the Buyer shall not acquire, and Seller shall retain, all of the following assets, properties and rights owned by Debtor (collectively, the "Excluded Assets").

(a)      All contracts and leases of Debtor that are not Assigned Contracts;

(b)      All cash and cash equivalents, bank accounts, security deposits, and similar financial assets of Debtor;

(c)      All of Debtor's advance payments, claims for refunds and deposits, and other prepaid items, including reserves held by credit card processors and other similar parties;

(d)      Debtor's notes receivable and all schedules, records and other documentation related thereto;

(e)      The original corporate seals, minute books, stock books, tax returns and other similar records relating to the Debtor's corporate organization, and all employee related or employee benefit related files or records other than personnel files of employees;

(f)      All of Debtor's original books and records, regardless of the medium on which such information is stored or maintained, including, without limitation, all employment records, Tax returns and financial statements, data and reports;

(g)      all insurance recovery rights of Debtor and all Tax refunds owing to Debtor; and

(h)      All rights to all claims, causes of action, choses in action, rights of recovery and rights of set-off (whether choate or inchoate, known or unknown, contingent or non-contingent) in favor of Seller, including such rights under section 506(c) of the Bankruptcy Code, and all avoidance causes of action existing under any of sections 544-553, inclusive, of the Bankruptcy Code.

**1.4      Assumed Obligations.**   Buyer shall assume at the Closing and pay, perform, and fully discharge when due: (a) obligations to customers for the remaining terms of prepaid subscriptions; (b) all of Seller's executory obligations arising after the Closing Date under the Assigned Contracts; and (c) all liabilities and obligations arising from the operation of the Purchased Assets by Buyer from and after the Closing Date (collectively, the "**Assumed Obligations**").

**1.5      Liabilities Not Being Assumed.**   Except for the Assumed Obligations, Buyer shall not be obligated to assume or perform and is not assuming or performing any liabilities or obligations of the Seller, whether known or unknown, fixed or contingent, certain or uncertain, and regardless of when such liabilities or obligations may arise or may have arisen or when they are or were asserted (the "Retained Liabilities"), and the Seller shall remain responsible for all

Retained Liabilities, which shall include, without limitation, any and all of the following obligations or liabilities of the Seller:

(a) Any compensation or benefits payable to present or past employees of Debtor arising in connection with their employment by Debtor, including, without limitation, any liabilities arising under any employee pension or profit-sharing plan or other employee benefit plan and any of the Debtor's obligations for vacation, holiday or sick pay;

(b) All federal, state, local, foreign or other Taxes other than Taxes arising in connection with the sale and/or transfer of the Purchased Assets as set forth herein;

(c) All Encumbrances (other than Permitted Encumbrances) on any of the Purchased Assets and all obligations and liabilities secured thereby that are not Assumed Obligations;

(d) All accounts or notes payable obligations for borrowed money, all purchase money obligations and any other indebtedness or payment obligations of Debtor (the "Retained Debt");

(e) Any claims, demands, actions, suits or legal proceedings that have been asserted or threatened against Debtor, the Business or the Purchased Assets or which may be threatened hereafter against the Purchased Assets, the Business or the Buyer that arises in any way from or in connection with (i) the Debtor's operation of the Business, or (ii) the Debtor's ownership of the Purchased Assets prior to the Closing, or (iii) any other business or non-business activities of Debtor, other than the Assumed Obligations as set forth herein; and

(f) Any obligations under any employment, consulting or non-competition agreement to which Debtor are a party (whether written or oral) other than in connection with the Assigned Contracts, and any liabilities or obligations arising out of the termination by Debtor of any of its employees in anticipation or as a consequence of, or following, consummation of the transactions contemplated hereby.

## ARTICLE II

## PURCHASE PRICE AND BANKRUPTCY MATTERS

**2.1    Purchase Price.** As consideration for the sale by Seller to Buyer of the Purchased Assets, Buyer, at the Closing, shall (i) pay Seller $1,300,000 (the "Purchase Price") in cash, in immediately available funds and (ii) assume the Assumed Obligations. An initial deposit of $100,000 shall be paid forthwith, with the balance to paid at closing.

**2.2    Allocation of Purchase Price.** The Purchase Price shall be allocated among the Purchased Assets and the Assumed Obligations, in the manner set forth in Exhibit B attached hereto (the "Purchase Price Allocation"). In the event that Exhibit B is not completed prior to the Closing Date, the Parties agree to complete the Purchase Price Allocation within ninety (90) days after the Closing Date. Each of the Parties, when reporting the transactions consummated hereunder in their respective tax returns, shall allocate the Purchase Price paid or received, as the

case may be, in a manner that is consistent with the Purchase Price Allocation set forth in Exhibit B hereto. Additionally, each of the Parties will comply with, and furnish the information required by Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and any regulations thereunder.

**2.3    Third Party Consents.**    Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign or transfer any governmental approval, instrument, contract, lease, permit or other agreement or arrangement, including Seller's Intellectual Property and/or the Assigned Contracts, or any claim, right or benefit arising thereunder or resulting therefrom if an assignment or transfer or an attempt to make such an assignment or transfer without the consent of a third party would constitute a breach or violation thereof or affect adversely the rights of the Buyer or the Seller, thereunder unless such assignment is approved by the Bankruptcy Court; and any transfer or assignment to the Buyer by the Seller, as applicable, of any interest under any such instrument, contract, lease, permit or other agreement or arrangement that requires the consent of a third party shall be made subject to such consent being obtained from the contracting party or approval being obtained from the Bankruptcy Court. In the event that any such consent or approval is not obtained on or prior to the Closing Date, the Seller shall use its reasonable best efforts to obtain any such approval or consent after the Closing Date.

**2.4    Payment of Cure Costs Under Assigned Contracts; Satisfaction of Section 365 of the Bankruptcy Code.** As promptly as practicable following the execution of this Agreement, Buyer and Seller shall use commercially reasonable efforts to cooperate and determine an estimate of the amounts required to cure all defaults under each Assigned Contract so as to permit the assumption and assignment of each such Assigned Contract pursuant to Section 365 of the Bankruptcy Code (as ultimately determined by the Bankruptcy Court, the "Cure Costs").

**2.5    Bankruptcy Court Approval.** The obligations of the parties herein are subject to entry of a Bankruptcy Court order approving the within sale and the absence of a stay of any such order fifteen days after such entry. Buyer acknowledges that the sale is subject to overbid at the hearing on the Seller's motion for approval of the sale. In the event that another party succeeds in overbidding the sale price herein, Buyer shall be entitled to a "break-up" fee equal to $40,000 in addition to a return of its $100,000 deposit.

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby makes the representations and warranties set forth hereinafter in this Article 3 to the Buyer:

**3.1    Authority and Binding Effect**.    Subject to the approval of the Bankruptcy Court, Seller has the full corporate power and authority to execute and deliver this Agreement and the Bill of Sale and any other documents or agreements executed in connection herewith or therewith (the "Supplemental Documents") . This Agreement, the Bill of Sale and the consummation by Seller of its obligations contained herein and therein have been duly authorized by all necessary

corporate actions of Seller and such agreements have been duly executed and delivered by Seller. Subject to the approval of the Bankruptcy Court, this Agreement is a valid and binding agreement of Seller, enforceable against such Seller in accordance with its terms, and, upon execution and delivery, the Bill of Sale will be a valid and binding agreement of Seller and shall be enforceable against it in accordance with its terms except as enforceability of the obligations of Seller under this Agreement and the Bill of Sale may be limited by (i) bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally, and (ii) general principles of equity relating to the availability of equitable remedies (whether such agreements are sought to be enforced in a proceeding at law or a proceeding in equity). Except for the approval of the Bankruptcy Court and the consents that may be necessary for assignment or Assigned Contracts, to Seller's knowledge it is not necessary for Seller to take any action or to obtain any approval, consent or release by or from any third person, governmental or other, to enable Seller to enter into or perform their obligations under this Agreement and the Bill of Sale.

**3.2    Organization and Standing.** Seller is a C corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller is qualified to do business in each jurisdiction in which the character of the business conducted by it or the location of the properties owned or leased by it make such qualification necessary, except in jurisdictions where the failure to be so qualified would not have a Material Adverse Effect on such Seller. Seller has the requisite corporate power and authority to conduct the Business as now conducted and to own or lease the Purchased Assets, and to use such Purchased Assets in the conduct of the Business.

**3.3    Condition and Title to Purchased Assets.**

(a)    **Purchased Assets**.  Buyer acknowledges and agrees that subject to the provisions of Section 5.1 below, it is purchasing, and shall take possession of, the Purchased Assets in their "AS IS, WHERE IS" and "WITH ALL FAULTS" condition and that it, effective as of the Closing Date, has previously been given the opportunity to conduct, and has conducted, such investigations and inspections of the Purchased Assets as it has deemed necessary or appropriate for the purposes of this Agreement;

(b)    **No Warranties Regarding Purchased Assets**.  **EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS, STATEMENTS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES REGARDING THE CONDITION, QUANTITY OR QUALITY OF ANY OR ALL OF THE PURCHASED ASSETS OR CONCERNING THE PAST, PRESENT OR FUTURE PROFITABILITY OR VIABILITY OF THE BUSINESS, AND ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED HEREBY BY SELLER.**

(c)    **Title to and Adequacy of Purchased Assets**. Seller shall have, and on the Closing Date will convey and transfer to Buyer, good and marketable title to all of the Purchased Assets material to the Business, free and clear of all Encumbrances of any nature whatsoever (other

than Permitted Encumbrances) to the extent provided in the Sale Order. All of the Purchased Assets (excluding those in possession of customers) are in the exclusive possession and control of Seller, and Seller has the unencumbered right to use, and to sell to Buyer in accordance with the terms and provisions of this Agreement, all of the Purchased Assets without interference from and, to the extent provided in the Sale Order, free of the rights and claims of others.

**3.4    Insurance.** Seller has delivered to Buyer true and correct copies of all policies of fire, general liability, worker's compensation, errors and omissions, malpractice and other forms of insurance maintained by or on behalf of Seller in connection with the Business as protection for the Purchased Assets. All of such policies are now in full force and effect. Seller has not received any written notice of cancellation or material amendment of any such policies. No coverage thereunder is being disputed; and all material claims thereunder have been filed in a timely fashion.

**3.5    Taxes and Tax Returns**. For purposes of this Agreement (a) the term "**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Internal Revenue Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not; and (b) the term "**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement (including, without limitation, information returns or reports related to back-up withholding and any payments to third parties) relating to any Taxes, including any schedule or attachment thereto, and including any amendment thereof. To Seller's knowledge, (i) all Tax Returns required to be filed with any taxing authority with respect to any taxable period ending on or before the date of this Agreement, or the Closing Date, as applicable, by or on behalf of Seller, has been or will be filed when due, (ii) all such Tax Returns are or will be true, complete and correct in all material respects, and (iii) all Taxes due and payable by Seller have been paid. Buyer shall have no liability or obligation whatsoever, and shall not incur any loss, expense or cost, and none of the Purchased Assets, or any assets of Buyer, shall be subjected to any Encumbrance (other than Permitted Encumbrances defined in Article XII), by reason of any Taxes arising out of (x) the Business as conducted by such Seller prior to the consummation of the sale hereunder of the Purchased Assets to Buyer, or (y) any other operations or activities of Seller whether conducted prior to the date hereof or hereafter. Seller further represents and warrants that it is relying solely on its own accountants and advisors for advice as to any/all tax consequences to it arising from the transactions contemplated hereby.

**3.6    No Broker**.  The Seller has not retained or used the services of an agent, finder or broker in connection with the transactions contemplated by this Agreement.  The Seller shall pay, and shall indemnify, hold harmless and defend the Buyer from and against, all commissions, finder's and other fees and expenses charged or asserted by any agent, finder or broker, by reason of any such retention or use of the services of any such agent, finder or broker by the Seller.

**3.7    No Hazardous Substances**. No hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Purchased Assets (including the premises leased pursuant to any Assigned Contract), except as Seller has disclosed to Buyer in writing.

Seller has complied, and will comply until the Closing Date, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby makes the representations and warranties set forth in this Section 4 to Seller:

**4.1    Authority and Binding Effect**.  Buyer has the full corporate power and authority to execute and deliver this Agreement and the Bill of Sale. This Agreement and the Bill of Sale and the consummation by Buyer of its obligations contained herein and therein have been duly authorized by all necessary corporate actions of Buyer and such agreements have been duly executed and delivered by Buyer. This Agreement is a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, and, upon execution and delivery, the Bill of Sale will be valid and binding agreements of Buyer and shall be enforceable against it in accordance with their terms, except as enforceability of the obligations of Buyer under this Agreement and the Bill of Sale may be limited by (i) bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally, and (ii) general principles of equity relating to the availability of equitable remedies (whether such agreements are sought to be enforced in a proceeding at law or a proceeding in equity). It is not necessary for Buyer to take any action or to obtain any approval, consent or release by or from any third person, governmental or other, to enable Buyer to enter into or perform its obligations under this Agreement and the Bill of Sale.

**4.2    Organization and Standing.** Buyer has requisite corporate power to own and operate its properties and assets, and to carry on the Business as presently conducted. Buyer is duly qualified to do business and is in good standing in each jurisdiction in which the character of the business conducted by it or the location of the properties owned or leased by it make such qualification necessary, except for jurisdictions in which the failure to so qualify would not have a Material Adverse Effect on Buyer.

**4.3    Compliance with Other Instruments.** The execution and delivery of this Agreement, the Bill of Sale and all other agreements to be entered into in connection herewith and the consummation of the transactions contemplated hereby and thereby will not conflict with or result in any violation of any law, rule, regulation, judgment, order, decree or ordinance applicable to Buyer or its properties or assets, or conflict with or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit, under (i) any provision of the certificate of incorporation or bylaws of Buyer; or (ii) any material agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license or any writ, order or decree to which Buyer is a party or by which Buyer or any of its property is bound and which would have a Material Adverse Effect on Buyer.

**4.4    Governmental Consent, etc.**  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or the consummation by Buyer of the transactions contemplated hereby, except for such consents, approvals, orders, authorizations, registrations, declarations and filings which if not obtained or made would not have a Material Adverse Effect on Buyer.

**4.5    No Broker.**  The Buyer has not retained or used the services of an agent, finder or broker in connection with the transactions contemplated by this Agreement.  The Buyer shall pay, and shall indemnify, hold harmless and defend the Seller from and against, all commissions, finder's and other fees and expenses charged or asserted by any agent, finder or broker, by reason of any such retention or use of the services of any such agent, finder or broker by the Buyer.

**4.6    Investigation.**  The Buyer acknowledges and affirms that, effective as of the Closing Date, it has completed its own independent investigation, analysis and evaluation of the Purchased Assets, that it has made all such reviews and inspections of the Purchased Assets as it deems necessary and appropriate, and that in making its decision to enter into this Agreement, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties other than those expressly set forth in this Agreement, as to which it has relied.

**4.7    As Is Basis**.  IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO TITLE. BUYER ACKNOWLEDGES AND AGREES THAT, UPON THE CLOSING, SELLER SHALL SELL AND CONVEY TO BUYER, AND BUYER SHALL ACCEPT, THE PURCHASED ASSETS ON AN "AS IS, WHERE IS, BASIS WITH ALL FAULTS."

**4.8    Funding.**  Buyer has all funding available to it to enable it to consummate its purchase o the Purchased Assets and to pay all of the other obligations of the Buyer under this Agreement. Buyer's entry into this Agreement and ability to perform under this Agreement is therefore not subject to any financing contingency.

**4.9    Representations and Warranties of Buyer.**  The representations and warranties of the Buyer contained herein do not contain any statement of a material fact that was untrue when made or omits any information necessary to make any such statement contained therein, in light of the circumstances under which such statement was made, not misleading.  The copies of all documents furnished by the Buyer to the Seller pursuant to the terms of this Agreement are complete and accurate copies of the original documents.

**4.10    Designee.**  Shilton and Shophet may designate, by written notice to Seller, a subsidiary to serve as the Buyer for all purposes under this Agreement at any time before Closing. Upon such designation, such subsidiary shall succeed to all rights and obligations of the Buyer, including the terms of this Article IV. Shilton and Shophet shall have no further obligations under this Agreement unless individually specified.

# ARTICLE V

## CONDUCT OF BUSINESS PENDING THE CLOSING

Between the date hereof and the Closing, and except as otherwise consented to by the Parties in writing, each of Buyer and Seller, as applicable, covenants as follows:

**5.1     Access.**

(a)    The Seller shall give to the Buyer and its representatives, from and after the date of execution of this Agreement, reasonable access during normal business hours to the premises, employees, agents and consultants of the Seller, and such copies of the Seller's books and records solely relating to the Purchased Assets and the Business (and, solely by way of illustration and not of limitation, excluding any Tax Returns of Debtor), contracts and leases and other documentation, so as to enable the Buyer to inspect and evaluate all aspects of the Business and the Purchased Assets. Seller hereby authorizes its employees to provide the foregoing information to Buyer upon entry of the Sale Order. This authority may only be rescinded upon written notice to both Buyer and the applicable employee.

(b)    The Buyer agrees to conduct its review, and to cause its representatives to conduct their review, in a manner designed to limit any disruption of the Seller's Business. The Buyer will hold any confidential information obtained pursuant to this Section 5.1 in accordance with the confidentiality provisions of any non-disclosure agreement ("NDA") entered into between the Buyer and the Seller.

**5.2     Notification of Certain Matters.**  The Seller shall give prompt notice to the Buyer of (i) the occurrence or non-occurrence, to the Seller's knowledge, of any event the occurrence or non-occurrence of which would cause any representation or warranty of the Seller contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date and (ii) any failure to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that the delivery of any notice pursuant to this Section 5.2 shall not limit or otherwise affect the remedies available hereunder to the Buyer. The Buyer shall give prompt notice to the Seller of the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would cause any representation or warranty of the Buyer contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date, and any failure to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that the delivery of any notice pursuant to this Section 5.2 shall not limit or otherwise affect the remedies available hereunder to the Seller.

# ARTICLE VI

## OBLIGATIONS SURVIVING THE CLOSING

**6.1     Further Assurances.**  Each Party shall execute and deliver after the date hereof such instruments and take such other actions as the other Party may reasonably request in order to

carry out the intent of this Agreement or to better evidence or effectuate the transactions contemplated herein.

**6.2    Expenses.**  Each Party shall pay all of its respective costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in carrying out and closing the transactions contemplated by this Agreement whether or not this Agreement or the transactions contemplated hereby are ever consummated.

**6.3    Taxes.**  The Buyer shall pay all Taxes of any kind or nature arising from the sale and transfer of the Purchased Assets to the Buyer.  The Seller shall pay all Taxes of any kind or nature arising from; (i) the conduct or operation of its Business up to the Closing Date and the conduct or operation by the Seller, prior to or after the Closing Date.  If any Taxes required under this Section 6.3 to be borne by the Seller are assessed against the Buyer or any of the Purchased Assets, the Buyer shall notify the Seller in writing promptly thereafter and the Seller shall be entitled to contest, in good faith, such assessment or charge so long as such assessment does not materially adversely affect the Buyer or the Purchased Assets or the Buyer's business. Notwithstanding the foregoing, the Buyer may (but shall not be obligated to) pay any such Taxes assessed against it, its business or any of the Purchased Assets, but which are payable by the Seller pursuant hereto, if the Buyer's failure to do so, in the reasonable judgment of the Buyer, could result in the immediate imposition of an Encumbrance on any of the Purchased Assets or any other assets of the Buyer or if the Seller fails to contest such assessment or charge diligently and in good faith.

**6.4    Indemnification.**  From and after the Closing Date, the Buyer agrees to indemnify, defend and save Seller, the Estates and its and their authorized agents, accountants, lenders, representatives, counsel and advisors, and their respective heirs, successors and assigns (each, an "***Indemnified Party***") from, and hold harmless each Indemnified Party against, and shall pay on demand, any and all claims, damages, obligations, costs, charges, fees, losses, liabilities and expenses (including, without limitation, the fees, charges and disbursements of counsel for any Indemnified Party) incurred by or asserted by a third party against any Indemnified Party, in each case arising out of or in connection with or resulting from (a) the ownership and/or use of the Purchased Assets from and after the Closing, and (b) all payment obligations due or owing by Buyer pursuant to this Agreement and all other documents, instruments, certificates or agreements entered into or delivered in connection herewith. Jeffrey Tinsley and his authorized agents, accountants, lenders, representatives, counsel and advisors, and their respective heirs, successors and assigns shall be neither Indemnified Parties nor third parties under this Paragraph 6.4, and Buyer shall have no indemnification obligations for any claims brought by or against them.

**6.5    Cooperation; Bankruptcy Court Approvals**.  The Parties shall use commercially reasonable good faith efforts to assist the other Party and cooperate with its respective legal counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement; and the Parties shall use their commercially reasonable good faith efforts to consummate the transactions contemplated herein and to fulfill their obligations hereunder.  Buyer and Seller each agree to use its commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable to satisfy the conditions to the other party's obligation to consummate and make effective the

transactions contemplated by this Agreement; provided, however, that nothing contained herein shall represent a covenant or guaranty of approval, completion or success with respect to any or all such procedures.

**6.6    Possession of Purchased Assets**. Seller will take all steps reasonably necessary to deliver the Purchased Assets. In addition, the Seller shall give prompt notice to the Buyer of any Purchased Assets that to the Seller's knowledge are in the possession, custody or control of another, and cooperate with the Buyer as reasonably practicable to deliver possession of such Purchased Assets to Buyer, including copies of any books and records.

## ARTICLE VII

## SURVIVAL OF REPRESENTATIONS AND WARRANTIES

All of the respective representations and warranties of the Seller and the Buyer set forth in this Agreement or in any certificates delivered by such Party on the Closing Date shall survive the consummation of the transactions contemplated hereby for one (1) year.  The covenants of any Party hereto that cannot be or are not fully performed by such Party on or prior to the Closing Date shall survive until they are otherwise terminated pursuant to their terms or fully performed.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

The obligation of the Buyer to consummate its purchase of the Purchased Assets from Seller is subject to the fulfillment, or the waiver by the Buyer, at or prior to the Closing, of each of the following conditions precedent:

**8.1    Representations and Warranties.**  The representations and warranties made by the Seller in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Closing Date, with the same force and effect as if made again at and as of that time.

**8.2    Performance of Obligations.**  The Seller shall have performed and complied, in all material respects, with all of the covenants required by this Agreement to have been performed prior to the Closing.

**8.3    Delivery of Additional Instruments.**  On the Closing Date, the Seller shall deliver, or cause to be delivered to the Buyer, the following documents and instruments, in form and substance satisfactory to the Buyer and its counsel, unless waived in writing by Buyer:

(a)    The Bill of Sale, duly executed by the Seller in substantially the form of Exhibit C hereto (the "Bill of Sale");

(b)    Assignments of trademarks for each of Seller's trademarks;

       (c)   Assignments of patents for each of Seller's trademarks; and

       (d)   Such other documents as may be necessary to transfer or evidence or record the transfer of the Purchased Assets.

**8.4**    **Sale Order.**  The Bankruptcy Court shall have entered the Sale Order, which order shall not be subject to any stay, in form and content reasonably acceptable to each of the Parties hereto, approving and authorizing Seller to implement this Agreement and sell, assign and transfer the Purchased Assets to Buyer pursuant to the terms and conditions hereof, and further, that, among other things, (a) authorizes the Seller to enter into such documents and agreements as may be necessary to implement such transaction; (b) approves and authorizes pursuant to Sections 105, 363, 365 and any other applicable provisions of the Bankruptcy Code the sale and transfer of the Purchased Assets to Buyer free and clear of any Encumbrances (including the Stipulated Order with the Federal Trade Commission) other than Permitted Encumbrances; (c) contains a finding that reasonable and adequate notice of the sale and transfer of the Purchased Assets to Buyer has been provided to all parties required to be given notice under the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Central District of California; and (d) also contains a finding that Buyer is a good faith purchaser entitled to the protections of Section 363(m).

**8.5**    **Absence of Material Litigation.**  There shall be (a) no pending or overtly threatened litigation (other than litigation which is determined by the parties in good faith, after consulting their respective attorneys, to be estopped by the Sale Order or without legal or factual substance or merit), whether brought against the Seller or the Buyer that seeks to enjoin the consummation of any of the transactions contemplated by this Agreement, (b) no order that has been issued by any court or governmental agency having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets hereunder or any proceedings pending which are reasonably likely to result in the issuance of such an order, and (c) no pending or overtly threatened litigation which has had or is reasonably expected to have a Material Adverse Effect on the Buyer.

## ARTICLE IX

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligation of the Seller to consummate the sale of the Purchased Assets to Buyer is subject to the fulfillment, or the waiver by the Seller, at or prior to the Closing, of each of the following conditions precedent:

**9.1**    **Representations and Warranties.**  The representations and warranties made by the Buyer in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Closing Date, with the same force and effect as if made again at and as of that time.

**9.2    Performance of Obligations.**  The Buyer shall have performed and complied in all material respects with all of its covenants required by this Agreement to have been performed by it at or prior to the Closing.

**9.3    Certificates.**  The Seller shall have received from the Buyer a certificate executed by an executive officer of the Buyer, dated as of the Closing Date and reasonably satisfactory in form and substance to the Seller, certifying that (i) each of the representations and warranties of the Buyer contained herein is true and correct as set forth in Article IV on and as of the Closing Date, (ii) the Buyer has performed and complied, with all of its covenants required to have been performed or complied, with by it pursuant hereto on or prior to the Closing Date.

**9.4    Delivery of Additional Instruments.**  Prior to the Closing Date, the Buyer shall deliver, or cause to be delivered to the Seller, the following documents and instruments, in form and substance satisfactory to the Seller and its counsel, unless waived in writing by the Seller:

(a)   The Bill of Sale duly executed by the Buyer.

## ARTICLE X

## THE CLOSING

The consummation of the transactions contemplated hereby (the "Closing") shall take place remotely via the exchange of documents and signatures by facsimile or electronic mail on a date which is at least fifteen (15) days after entry by the Bankruptcy Court of the Sale Order, but no later than twenty-one (21) days after entry or at such later date and time upon which the Buyer and Seller agree, subject to the satisfaction or waiver of the closing conditions set forth in Section 8 and Section 9 above (the "Closing Date"). All deliveries at the Closing will be deemed to take place simultaneously and no deliveries (including payment of the Purchase Price) will be deemed to have occurred until the conclusion of the Closing. The Closing will be deemed concluded upon the concurrence of the Buyer, the Seller and their respective counsel. The Closing shall be deemed to have occurred at 11:59 p.m., Pacific time, on the Closing Date, such that the Buyer shall be deemed the owner of the Purchased Assets on and after the Closing Date.

**10.1    Closing Deliveries of Seller.**  At the Closing, the Seller shall deliver, or cause to be delivered to the Buyer, the documents and instruments set forth in Section 8 above, in form and substance reasonably satisfactory to the Buyer and its counsel.

**10.2    Closing Deliveries of Buyer.**  At the Closing, the Buyer shall deliver, or cause to be delivered, the balance of the Purchase Price to the Seller and the documents and instruments set forth in Section 9 above, in form and substance reasonably satisfactory to the Seller and its counsel.

**10.3    Outside Agreement Date.**  Notwithstanding the exhibits attached hereto as of the Effective Date, the Parties acknowledge and agree that Seller may, subject to the Buyer's consent, amend said exhibits by no later than the Outside Agreement Date, and, upon such consent by the Buyer, such exhibits shall be deemed appended to and included in this Agreement. The "Outside Agreement Date" shall be the date that the Bankruptcy Court approves the Sale Order, or such later date as the Parties may agree.

## ARTICLE XI

## TERMINATION

**11.1    Termination.**    Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by mutual written agreement of the Buyer and the Seller;

(b)    by the Buyer if there has been a material breach by the Seller of its representations, warranties or covenants set forth herein or if any condition to the obligation of the Buyer under this Agreement to be complied with or performed by the Seller at or before the Closing shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by the Buyer;

(c)    by either the Buyer or the Seller if any judgment, injunction, order or decree of a court or other governmental entity of competent jurisdiction enjoining the Buyer or the Seller from consummating the transactions contemplated by this Agreement shall have been entered; or

(d)    by the Seller if there has been a material breach by the Buyer of its representations, warranties or covenants set forth herein or if any condition to the obligation of the Seller under this Agreement to be complied with or performed by the Buyer at or before the Closing shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by the Seller.

**11.2    Procedure Upon Termination.**    In the event of termination of this Agreement by the Buyer or the Seller or by both the Buyer and the Seller pursuant to Section 11.1 hereof, the transactions contemplated herein shall be abandoned without further action by the Buyer or the Seller; provided, however, that:

(a)    Each Party will redeliver all documents, workpapers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(b)    All information of a confidential nature received by any Party hereto with respect to the business of any other Party (other than information which is a matter of public knowledge or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with any governmental authority) shall continue to be subject to any NDA between the Buyer and the Seller.

(c)    Upon any termination of this Agreement pursuant to this Section 11, except as otherwise set forth in this Agreement, the respective obligations of the Parties under this Agreement shall terminate and no Party shall have any liability whatsoever to any other Party by reason of such termination, irrespective of the cause of such termination, except as set forth in this Section.

## ARTICLE XII

## MISCELLANEOUS

**12.1    Assignment.** Neither the Buyer nor the Seller may assign this Agreement, or assign its rights or delegate its duties hereunder, without the prior written consent of the other Party.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and assigns.

**12.2    Severability.** If any provision of this Agreement or portion thereof is determined by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, then such provision, to the extent permitted by the Bankruptcy Court, will not be voided but will instead be construed to give effect to its intent to the maximum extent permissible under applicable law and the remainder of this Agreement will remain in full force and effect according to its terms.

**12.3    Governing Law.** This Agreement shall be governed by and construed in accordance with the Bankruptcy Code, to the extent applicable, and, where state law is implicated, the internal laws of the state of California, without giving effect to any principles of conflicts of law.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, the Parties agree that if any dispute arises out of or in connection with this Agreement or any of the documents executed hereunder or in connection herewith, the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Agreement.  The Bankruptcy Court shall have sole jurisdiction over such matters and the parties affected thereby, and Buyer and the Seller each hereby consent and submit to such jurisdiction; unless the  Bankruptcy Case has closed and cannot be reopened, the Parties irrevocably consent to the exclusive jurisdiction of the Federal and State courts in the State of California, County of Los Angeles in connection with any action or proceeding. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in <u>Section 12.8</u> hereof, unless another address has been designated by such Party in a notice given to the other Party in accordance with the provisions of <u>Section 12.8</u> hereof.

**12.4    Entire Agreement; Amendment.** This Agreement and the Exhibits and Schedules hereto, and each additional agreement and document to be executed and delivered pursuant hereto, constitute all of the agreements of the Parties with respect to, and supersede all prior agreements and understandings relating to the subject matter of, this Agreement or the transactions contemplated by this Agreement.  This Agreement may not be modified or amended except by a written instrument specifically referring to this Agreement signed by the Parties.

**12.5    Waiver.**  No waiver by one Party of the other Party's obligations, or of any breach or default hereunder by any other Party, shall be valid or effective, unless such waiver is set forth in writing and is signed by the Party giving such waiver; and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature or any other breach or default by such other Party.

**12.6    Interpretation; Headings.**  This Agreement is the result of arms'-length negotiations between the Parties and no provision hereof, because of any ambiguity found to be contained therein or otherwise, shall be construed against a Party by reason of the fact that such Party or its legal counsel was the draftsman of that provision.  The section, subsection and any paragraph headings contained herein are for the purpose of convenience only and are not intended to define or limit or affect, and shall not be considered in connection with, the interpretation of any of the terms or provisions of this Agreement.

**12.7    Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed to be an original instrument enforceable in accordance with its terms.  This Agreement may be executed and delivered by facsimile or by electronic mail (e.g., PDF) and any such signature shall be valid and binding as if they were originals.

**12.8    Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 12.8):

If to Seller: Carolyn A. Dye

[·]. cdye@cadye.com

with a copy to (which shall not constitute notice) given in a like manner to:

[·] James A. Dumas

jdumas@dumas-law.com

If to Buyer, to:

Shilton Investments, Inc.
c/o Albert Shilton
37 Neil Bay Drive,
Roche Harbor, WA 98250
albertrshilton@gmail.com

and

with a copy to (which shall not constitute notice) given in a like manner to:

Arthur Greenberg, Esq.; Jeremy H. Rothstein, Esq.
G&B Law, LLP
16000 Ventura Boulevard, Suite 1000
Encino, California 91436
Email: agreenberg@gblawllp.com; jrothstein@gblawllp.com
Fax: (818) 986-6534

**12.9    No Construction Against Preparer**.  No provision of this Agreement or the other Transaction Documents shall be construed against or interpreted to the disadvantage of any Party by any court or other governmental or judicial authority by reason of such party's having or being deemed to have prepared or imposed such provision.

**12.10    Partial Invalidity**.  All rights and restrictions contained herein may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws, and are intended to be limited to the extent necessary to render this Agreement legal, valid and enforceable.   If any term of this Agreement, or part thereof, not essential to the commercial purpose of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining terms hereof, or part thereof shall constitute their agreement with respect to the subject matter hereof and all such remaining terms, or parts thereof, shall remain in full force and effect.   To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision that will implement the commercial purpose of the illegal, invalid or unenforceable provision.

**12.11    Schedules**.  The section numbers referenced in the Schedules attached hereto refer to the corresponding sections of this Agreement.  The headings contained in the Schedules are for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Agreement. The Schedules attached shall not be deemed to supersede, amend, or modify any of the terms or provisions of this Agreement.  In the event of a conflict or ambiguity between the provisions of this Agreement and the Schedules, the provisions of this Agreement will be controlling.

**12.12  Public Announcements.**  Neither the Buyer or the Seller will make any public announcements concerning matters set forth in this Agreement or the negotiation thereof without the prior written consent of the other Party unless such disclosure is required by law or court order. Any such disclosure shall be provided for review to the other Party in advance of public release to the extent reasonably practical.  Buyer recognizes that Seller is a bankruptcy trustee, subject to various fiduciary obligations, including, but not necessarily limited to, the obligation to make certain disclosures to the Bankruptcy Court, creditors, and parties in interest.  As a result, notwithstanding anything to the contrary in this Section 12.12, Seller and its retained professionals shall be permitted to make any public announcements, including, but not limited to, through filings with the Bankruptcy Court in the public record or on the record at Bankruptcy Court hearings, that either Seller or its retained professionals deem, in their sole and exclusive discretion, and with or without the consent (written or otherwise), are necessary or appropriate to ensure Seller complies and otherwise fulfils its obligations.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF,** each of Buyer and Seller have executed this Asset Purchase Agreement as of the date first written above.

**Carolyn A. Dye**
as Chapter 7 Trustee of Mylife.com

_____

**Shilton Investments, Inc.**
a California corporation

By: _____
Name: Albert Shilton
Title: Chief Executive Officer

## EXHIBIT A

## Definitions

For the purposes of this Agreement, unless the context otherwise requires, the following terms shall have the respective meanings set forth below and grammatical variations of such terms shall have corresponding meanings:

"**Affiliate**" shall mean, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.

"**Auction**" means the auction sale, if any, to be held at the Bankruptcy Court at the date and time determined by the Bankruptcy Court.

"**Business Day**" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of California are authorized or required by law or other governmental action to close.

"**Encumbrance(s)**" means any lien, claim, encumbrances, interest of any kind, charge, hypothecation, pledge, mortgage, title retention agreement, security interest of any nature, restriction (other than restriction on transfer with respect to the Assigned Contracts), condition or any adverse interest of any nature, claim, exception, right of set-off, reservation, easement, right of occupation, any matter capable of registration against title, option, right of pre-emption, privilege, restriction, or any contract or agreement to create any of the foregoing.

"**Intellectual Property Rights**" encompass all forms of intellectual and industrial property rights and assets, plus associated rights and protections, whether licensed or not, from any jurisdiction globally, registered or unregistered. This includes: (a) patents and patent applications, utility models, design patents, and governmental grants for inventions or industrial designs; (b) trademarks, service marks, trade names, logos, trade dress, and related goodwill, registrations, and renewals; (c) authorship works, designs, copyrights, and related rights, plus their registrations and renewals; (d) internet domain names, social media accounts, web content, and URLs; (e) trade secrets, know-how, business plans, confidential information, and related rights; (f) databases, data collections, and related access information; (g) computer software and code, including derivative works; (h) rights of publicity and privacy; (i) rights to sue for infringements and violations; (j) tangible embodiments and documentation of the foregoing; and (k) associated goodwill, including rights to use, modify, license, sue for infringements, file registrations, and create derivatives of the Intellectual Property Rights.

"**Laws**" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies, or court of competent jurisdiction, or other requirement or rule of law.

"**Material Adverse Effect on Seller**" and "**Material Adverse Effect on its Business**" shall both mean a circumstance, state of facts, event, consequence or result that materially and adversely affects, or could reasonably be expected to affect materially and adversely the Purchased

Assets or the business operations, or condition (financial or otherwise) of Seller's Business or the ability of Seller to consummate the transactions which it is required to consummate hereunder.

**"Material Adverse Effect on Buyer" and "Material Adverse Effect on its Business"** shall mean a circumstance, state of facts, event, consequence or result that materially and adversely affects, or could reasonably be expected to affect materially and adversely business or the financial condition or operating results of Buyer or the ability of Buyer to consummate the transactions which it is required to consummate hereunder.

**"Permitted Encumbrances"** means those Encumbrances, if any, as set forth in <u>Schedule 3.3</u> hereof, and such other Encumbrances as the Buyer may approve in writing in its sole discretion or which do not, individually or in the aggregate, adversely affect the operation of the Business.

**"Person"** means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts, Indian tribes or other organizations, whether or not legal entities.

**"Tax"** or **"Taxes"** means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not.

**"Tax Return"** means any return, declaration, report, claim for refund, or information return or statement (including, without limitation, information returns or reports related to back-up withholding and any payments to third parties) relating to any Taxes, including any schedule or attachment thereto, and including any amendment thereof.

## EXHIBIT B

### Purchase Price Allocation

The Purchase Price shall be allocated among the Purchased Assets as follows:

|  |  |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# EXHIBIT C

## Bill of Sale

**Error! Unknown document property name.**

# BILL OF SALE

1.    <u>Sale and Transfer of Assets</u>. For good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by that certain Asset Purchase Agreement dated as of March __, 2024 (the "Agreement"), by and between Shilton Investment, Inc. ("Shilton"), a corporation incorporated under the laws of the state of California, and its permitted designee(s) ("Buyer"), on the one hand, and Carolyn A. Dye, as Chapter 7 Bankruptcy Trustee ("Seller") for Mylife.com, Inc., a C corporation incorporated under the laws of the state of Delaware ("Debtor"). Seller hereby sells, transfers, assigns, conveys, grants and delivers to Buyer, effective as of _____, 2024 (the "Effective Date"), all of Debtor's right, title and interest in and to all of the Purchased Assets (as defined in the Agreement).

2.    Seller covenants and agrees, upon request, to execute, acknowledge, and deliver any further assignments, conveyances and other assurances, documents, and instruments of transfer, reasonably requested by Buyer and to take any other action consistent with the terms of the Agreement that may reasonably be requested by Buyer for the purpose of assigning, transferring, granting, conveying, and confirming to Buyer, or reducing to possession, any of the Purchased Assets to be conveyed and transferred by the Agreement, provided that Seller shall not be required to incur any expense or liability in connection therewith.

3.    The terms of the Agreement are incorporated herein by this reference and shall remain full force and effect to the full extent provided therein. In the event of any conflict between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the date first written above.

**Carolyn A. Dye**
as Chapter 7 Trustee of Mylife.com

_____

## DECLARATION OF ALBERT SHILTON

I, Albert Shilton, declare:

1.      I am the principal of Shilton Investments, Inc., the proposed purchaser of substantially all of the assets of MyLife.com. I am providing this declaration in support of the motion of the MyLife trustee, Carolyn A. Dye, for an order authorizing the sale. I have personal knowledge of the facts stated herein and could and would competently testify thereto.

2.      I am primarily a real estate investor and Shilton Investments is a real estate investment company. I have had no experience investing in companies such as MyLife.com that offer services on the internet. I came to be aware of the activities of MyLife through my personal friendship with Anthony Mazzarella, the Chief Financial Officer of MyLife. Over the last several years I heard about the difficulties MyLife was having and I eventually concluded that if the going concern value of the company could be preserved and liberated from the legal nightmare it had been enduring, the assets of the company would represent a significant investment opportunity. Initially, I partnered in exploring the opportunity with an entity known as Shophet Investment Fund I, LLC, the principals of which were David and Morad Shophet. The Shophets, like me, are primarily real estate investors. More recently, I have instead chosen to partner with a Geoffrey Barker, a retired entrepreneur with experience in internet businesses. It is our intention to assign the rights and obligations of Shilton Investments under the Asset Purchase Agreement to a single purpose entity owned by Mr. Barker and myself, directly or indirectly.

3.      I have had no role in managing the operations of MyLife up to this point and I have had no personal or business relationship with MyLife's CEO, Jeffrey Tinsley. The same is true of Mr. Barker. We do not intend for Mr. Tinsley to have any role in the new company, either as an employee, shareholder, or outside consultant. On the other hand, we would like to hire substantially all of the other employees of MyLife and we are particularly interested in obtaining the services of my friend, Mr. Mazzarella, and of David Wolfe, the Vice-President for Products.

4.      We intend to establish an equity incentive plan for employees within that new entity, as is customary technology companies, with a limited opportunity for investment for the Debtor's

employees. Thus far, Shilton has only discussed this with Messrs. Wolfe and Mazarella, each of whom has indicated an interest in investing.

5.    A material condition for our willingness to purchase the assets is that we acquire them free and clear of any obligation imposed by the Stipulated Order that MyLife entered into with the Department of Justice in 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of March, 2024 at Friday Harbor, Washington..

/s
Albert Shilton

## DECLARATION OF GEOFFREY BARKER

I, Geoffrey Barker, declare:

1.       I am providing this declaration in support of the motion of the MyLife trustee, Carolyn A. Dye, for an order authorizing the sale. I have personal knowledge of the facts stated herein and could and would competently testify thereto.

2.       I am a retired entrepreneur with experience in internet businesses. I have had no role in managing the operations of MyLife up to this point, and I have had no personal or business relationship with MyLife's CEO, Jeffrey Tinsley. I do know Anthony Mazzarella socially. Neither Albert Shilton nor I intend for Mr. Tinsley to have any role in the new company, either as an employee, shareholder, or outside consultant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of March, 2024 at _Seattle_, Washington.

Geoffrey Barker

### DECLARATION OF ANTHONY MAZZARELLA

I, Anthony Mazzarella, declare:

1. I am the Chief Financial Officer of MyLife.com, the debtor in a Chapter 7 bankruptcy. I am providing this declaration in support of a motion by the MyLife trustee, Carolyn A. Dye, for a bankruptcy court order authorizing the sale of the assets of My Life to a company known as Shilton Investments, Inc. I have personal knowledge of the facts stated herein and could and would competently testify thereto.

2. I have worked for MyLife since December 28, 2018. David Wolfe, the Vice-President for Products, has worked there since 2021. Neither of us worked at the company during the period of alleged "bad-acting" that was the subject of the lawsuit brought against the company by the Department of Justice. All the key managers from that earlier period left the company several years ago and only about five or six among the remaining twelve company employees were around during that earlier period.

3. I own about 3% of the stock in the company and I believe that the total stock owned by all of the current employees is approximately 5%.

4. I have known Al Shilton socially for several years. I have been discussing the ordeals of MyLife with him since I first started working there but it has only been very recently that the discussion turned to a possible purchase by him of the assets of the company. If his company is able to purchase the MyLife assets, I would like to work for it.

5. The Domain name MyLife.com was originally purchased for approximately $1 million but I do not believe that its value today, independent of the company as a going concern, would exceed $200,000. MyLife owns a number of other domain names. However, I believe that the only ones with potential independent value are Reunion.com, TheRealMe.com, and Addressbook.com. In my capacity as CFO of Debtor, I received numerous purchase inquiries regarding Reunion.com. None of them exceeded $60,000.

6. Aside from the modest independent value of the domain names I believe that the remaining assets of the company only derive their remaining value from the company as a going concern. Furthermore, anyone buying the assets will need to be certain that it will not be subject to the terms of the 2021 Stipulated Order between the Debtor and DOJ. Of particular concern is that order's prohibition against "negative option" contracts with its

subscribers that automatically renew. Such a blanket prohibition is not required by the controlling consumer protection statutes and all of MyLife's major direct competitors have some type of "negative option," automatic renewal contracts. The prohibition against "negative option" contracts has been responsible for a more than 80% reduction in MyLife's revenues.

7. The company's CEO and 51% shareholder, Jeffrey Tinsley, has had relationships with the management of larger competitors of the company, such as Peoplefinders.com and InstantCheckmate.com, and in the last year I have been aware of discussions with those parties regarding a purchase of the company's assets. Although I would have thought that these larger competitors would be the natural purchasers, they in fact showed little interest, apparently because the MyLife brand has been severely tarnished by the DOJ lawsuit.

8. The Debtor's entire business concerns personal information about individuals. However, substantially all of that information was obtained from public records or databases of publicly available information. The only information which has been provided to the Debtor by the customers themselves has come from (1) registered (but non-paying) users who have provided confirmation that the public information the Debtor already has, concerns them, and who have confirmed and/or provided their email addresses, and (2) paid users who, in addition to the foregoing, have provided credit card information. As of the bankruptcy filing, there was no policy whatever in effect, let alone one that was disclosed to the Debtor's customers, that prevented the transfer by the Debtor to third parties of any of the information it had received from the customers, or that it otherwise had in its possession regarding them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of March, 2024 at Friday Harbor, Washington.

Anthony Mazzarella

| In re: MYLIFE.COM | CHAPTER: 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:22-bk-14858-VZ |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 915 Wilshire Blvd., Ste. 1775, Los Angeles, CA 90017.

A true and correct copy of the foregoing document entitled (*specify*): *__Memorandum of Points and Authorities in support of Trustee's Motion for Order Authorizing Sale of the personal property of the estate consisting of substantially all of the debtors assets, free and clear of interests, subject to higher & better offers, and approving overbidding procedures; Declarations of Carolyn A. Dye, Albert Shilton, GeoffreyBarker, and Anthony Mazzarella in Support Thereof__*    will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **__March 26, 2024__**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Julian K Bach    Julian@Jbachlaw.com, julianbach@sbcglobal.net
Paul A Beck    pab@pablaw.org, raychael@pablaw.org
Shraddha Bharatia    notices@becket-lee.com
Bradley E Brook    bbrook@bbrooklaw.com, paulo@bbrooklaw.com; brookecfmail@gmail.com
Shawn M Christianson    cmcintire@buchalter.com, schristianson@buchalter.com
Leslie A Cohen    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com; clare@lesliecohenlaw.com
Jamie P Dreher    jdreher@downeybrand.com, mfrazier@downeybrand.com; courtfilings@downeybrand.com
James A Dumas    jdumas@dumas-law.com, jdumas@ecf.inforuptcy.com
Arthur A Greenberg    agreenberg@gblawllp.com, mkerpik@gblawllp.com
Christian T Kim    ckim@dumas-law.com, ckim@ecf.inforuptcy.com
Dare Law    dare.law@usdoj.gov, ron.maroko@usdoj.gov
Leah Victoria Lerman    leah.v.lerman@usdoj.gov
Kelly L Morrison    kelly.l.morrison@usdoj.gov
Jeremy H Rothstein    jrothstein@gblawllp.com, msingleman@gblawllp.com
David Samuel Shevitz    David.S.Shevitz@usdoj.gov
Jolene Tanner    jolene.tanner@usdoj.gov, USACAC.criminal@usdoj.gov
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Christopher VanDeusen    christopher.k.vandeusen@usdoj.gov
Hatty K Yip    hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) **__March 26, 2024__**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **__March 26, 2024__**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
Howard M Ehrenberg  ehrenbergtrustee@sulmeyerlaw.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| **__March 26, 2024__** | Danielle M. Landeros | /s/ *Danielle M. Landeros* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        **F 9013-3.1.PROOF.SERVICE**